KENNETH M. RIDDER AND MARIA L. RIDDER, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12954–78.     Filed June 1, 1981.

*Ronald E. Cummings*, for the petitioners.
*Jeannette A. Cyphers*, for the respondent.

OPINION

FAY, *Judge*: Respondent determined a deficiency of $2,731 in petitioners' Federal income tax for 1975. After concessions, the issues presented are (1) whether petitioners may deduct under section 162(a)[1] the entire amount of union dues paid during the year where portions of such dues were allocated by the union to

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue.

a building fund and to a fund for the construction of recreational facilities for the members, and (2) whether petitioners are entitled to an investment credit for new equipment purchased and then leased to petitioner-husband's employer.

All of the facts were stipulated and are found accordingly.

Petitioners Kenneth M. Ridder and Maria L. Ridder, husband and wife, resided in Anchorage, Alaska, when they filed their petition in this case.

During 1975, Kenneth M. Ridder (hereinafter petitioner) was employed as a truck driver by Sea-Land Service, Inc. (Sea-Land), in Anchorage, Alaska. As a condition of his employment, he was required to be a member of Local 959 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America (Local 959 or the union). To maintain good standing with Local 959, members were required to pay fixed monthly dues as well as additional dues for each hour they worked. The monthly dues were paid personally by the members, while the hourly dues were deducted from the members' paychecks by their employers and transmitted directly to the union.

On December 17, 1963, Local 959 adopted a plan whereby 3 cents of the hourly dues of each member was specially allocated to a union building fund. It was agreed that for each $50 collected from a member for the building fund, the member would receive a "Building Fund Owners Certificate" which certified "that Fifty Dollars ($50.00) of the Union dues paid by the holder hereof has been deposited to * * * Local 959 Building Fund." By their terms, the certificates were redeemable with interest[2] at the completion of the building program. They were also redeemable without interest when the holder died or, if he was eligible for an honorable withdrawal card from the union, when he retired or left the jurisdiction of Local 959. The certificates stated that they were not transferable and that they did not constitute an interest in the assets of Local 959.

With its building fund, Local 959 constructed or purchased buildings in Anchorage, Kenai, Juneau, and Valdez, Alaska, which were used principally for union offices. At the time the

---

[2]No rate of interest was specified on the certificate, but the plan adopted by Local 959 authorizing the building fund provided for interest on the certificates of no more than 4¾ percent per year.

stipulated record in this case was submitted, the union was seeking to organize other industries in Alaska, and, if successful, it will need more office space. Also, the building in Juneau will probably have to be replaced in the near future. The union has not yet declared its building program completed.

In July 1974, Local 959 began seeking an increase of 15 cents in the hourly dues deducted by employers when it renegotiated collective bargaining contracts. The union planned to spend the increase to construct recreation centers in Anchorage and Fairbanks for its members. In 1974, planning for the centers was begun, and in that year the employees of Sea-Land approved a new collective bargaining contract in which the increase in hourly dues was included. Local 959 collected $2,939,474.60 in 1975 from the increase in dues.

The recreation centers in Anchorage and Fairbanks were built during 1976 and 1977. On May 22, 1977, the centers opened. Each had tennis courts, handball courts, locker rooms, exercise rooms, saunas, steamrooms, a jogging track, swimming pool, child care center, pro shop, gymnasium, and other facilities. When the record herein was submitted, the cost of the recreation centers totaled $15,153,217, of which $5,203,218 had been paid by the union and the balance had been borrowed.

A union member received and maintained eligibility to use the recreation centers by accumulating "recreation hours," that is, hours of work for which the 15-cent recreation dues were subtracted from pay. A member received his first month of eligibility by accumulating 300 recreation hours, and he received 1 additional month for every additional 80 hours accumulated. After the first month, a member could also pay $30 to obtain 1 month of eligibility if he did not have sufficient recreation hours. Such eligibility rules were formulated by the union in 1977; prior to that time petitioner had no vested rights in the recreation centers.

In 1975, petitioner paid $1,380.44 as dues to Local 959. Of this amount, $144 was monthly dues, and $1,236.44 was payroll deductions. The payroll deductions were allocated on the accounting records of Local 959 as follows:

Strike fund ....................................... $463.66
Recreation centers ............................... 463.66

Credit union ................................... $216.35

Building fund ................................... 92.77

On his income tax return for 1975, petitioner deducted union dues of $1,237.29.

On May 28, 1975, petitioner acquired a new White tractor-truck (the truck or the White truck). Petitioner's basis in the truck was $33,033.51; the truck's useful life was 6 years. Under a lease dated June 3, 1975, petitioner leased the truck to his employer, Sea-Land, for whom he drove the truck. Petitioner was required to maintain the truck "in good working condition." Otherwise, however, Sea-Land had full responsibility for and control over the truck's operation, and furnished fuel. As consideration, Sea-Land paid petitioner a royalty of 30 cents per mile.

The lease's duration was indefinite. The lease provided only that it would end "Upon thirty (30) days written notice by either party, or upon mutual consent of both parties on or after July 3, 1975." In 1976, the lease was suspended for a time while maintenance was performed on the truck. During that period, petitioner rented another truck which he subleased to Sea-Land on terms similar to the White truck's lease. Later in 1976, the White truck was demolished in an accident.[3]

In his notice of deficiency, respondent determined that those portions of petitioner's hourly dues allocated to the recreation centers, the credit union, and the building fund were not deductible. Respondent also disallowed the investment credit claimed by petitioner for 1975 based upon his purchase of the White truck.

Petitioner has conceded that the portion of his dues allocated to the credit union was not deductible. Thus, the issues to be decided are whether petitioner's dues allocated to the building fund and to the recreation centers were deductible under section 162(a) and whether petitioner was entitled to an investment credit for the White truck.

### 1. Union Dues

As the parties have recognized on brief, the facts and issues presented with respect to union dues are virtually identical to

---

[3]Accordingly, in 1976 petitioners recaptured the investment credit they had taken for the truck's purchase in 1975.

those in *Briggs v. Commissioner*, 75 T.C. 465 (1980), appeal filed (9th Cir., Feb. 11, 1981), involving two other members of Teamsters Local 959. We adhere to our position in *Briggs* for the reasons stated therein, which we incorporate by this reference. Accordingly, we decide petitioner may not deduct those portions of his dues allocated to the building fund and to the recreation centers.

## 2. Investment Credit

The remaining question concerns the investment credit petitioner claimed for the new White tractor-truck which he leased to and drove for Sea-Land. Section 38 allows a tax credit for investment in certain depreciable property. Respondent does not dispute that the White truck was "new section 38 property" as defined in section 48(a) and (b). At issue are the limitations in section 46(e)(3) imposed on noncorporate lessors.

Section 46(e)(3) provides:

SEC. 46(e). LIMITATIONS WITH RESPECT TO CERTAIN PERSONS.—

(3) NONCORPORATE LESSORS.—A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if—

(A) the property subject to the lease has been manufactured or produced by the lessor, or

(B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property.

Section 46(e)(3)(B) applies herein because petitioner is an individual, not a corporation; because petitioner leased the White truck to Sea-Land; and because petitioner did not manufacture the truck, he bought it. Thus, petitioner will be allowed an investment credit only if, first, the term of the lease including options to renew was less than 50 percent of the truck's useful life and if, second, over the first year of the lease deductions attributable to the truck, other than those for interest, taxes, depreciation, reimbursed expenses, and rents (generally, operating expenses) exceeded 15 percent of rental income. See generally sec. 1.46–4(d)(1)(ii) and –4(d)(3)(ii), Income Tax Regs. The parties stipulated that petitioner met the 15-

percent test. Accordingly, this case turns on the narrow issue whether "the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property." Sec. 46(e)(3)(B). See generally *Bloomberg v. Commissioner*, 74 T.C. 1368 (1980).

Section 46(e)(3) is a fairly technical provision which can best be understood in terms of its purpose. In general, Congress was concerned that individuals might be tempted to use investment credits to finance the acquisition and leasing of depreciable property as tax shelters. S. Rept. 92–437 (1971), 1972–1 C.B. 559, 583. Thus, Congress tried to make investment credits available only to those noncorporate lessors actually using the property in question in an active business. These were determined to be lessors who had themselves manufactured or produced the property, and short-term lessors. Conversely, Congress wanted to deny investment credits to purchaser-lessors involved in mere financing arrangements without the risks and obligations associated with an ongoing trade or business.[4] To exclude such long-term lessors, section 46(e)(3)(B) denies an investment credit to a noncorporate lessor where the lease term including options to renew equals or exceeds 50 percent of the property's useful life. We must decide whether the lease in this case passes or fails the 50-percent test.

The White truck's useful life was 6 years. Petitioner first argues that the term of the lease was less than 3 years because the truck was demolished in an accident in its second year of service. We disagree.

In *Bloomberg v. Commissioner*, 74 T.C. 1368 (1980), the taxpayer, an individual, purchased medical equipment with useful lives of 5 to 7 years, which was immediately leased to a corporation for a term of 5 years. The lease was purportedly canceled in its third year. We held that section 46(e)(3)(B) disallowed the claimed investment credit notwithstanding the lease cancellation. Thus, in *Bloomberg* we held that the terms of the lease entered into, and not actual subsequent events, are controlling to determine a lessor's entitlement to investment credit.[5] 74 T.C. at 1372. The case applies and stands for the more

---

[4]See *Meagher v. Commissioner*, T.C. Memo. 1977–270; Rev. Rul. 76–266, 1976–2 C.B. 10.

[5]Sec. 1.46–4(d)(4), Income Tax Regs., dealing with aggregation of successive lease terms, could be read to the contrary; but respondent has specifically disclaimed such an interpretation

general proposition that allowance of an investment credit is based on the facts and circumstances in existence in the year property is placed in service. *World Airways, Inc. v. Commissioner*, 62 T.C. 786 (1974), affd. 564 F.2d 886 (9th Cir. 1977). See sec. 1.46–3(d)(4)(i), Income Tax Regs.

Petitioner urges us to consider *Stewart v. United States*, an unreported case (D. Neb. 1977, 40 AFTR 2d 77–5735, 77–2 USTC par. 9648), which disallowed a lessor's claimed investment credit under section 48(a)(5) (Government use). That opinion states, "the controlling question is the duration of the actual use rather than the term of any single lease."[6] (40 AFTR 2d at 77–5737, 77–2 USTC par. 9648, at 88,177.) We respectfully disagree with the District Court for the District of Nebraska to the extent its views are inconsistent with our own.

More importantly, however, we think the cases are reconcilable. In *Stewart*, the District Court decided that a lease which either party could cancel upon 30 days' notice after the first 6 months was not a "short-term lease" within the meaning of section 1.48–1(k), Income Tax Regs. The court first stated that the duration of the lease was not de minimis in any case, and then went on to hold:

> While the regulations speak in terms of short-term or casual leases, in the instant case the controlling question is the duration of the actual use rather than the term of any single lease, *since the leases were subject to automatic renewal unless the parties took affirmative action.* [40 AFTR 2d at 77–5737; emphasis added.]

This sentence is best understood as applying the rule that in interpreting the language chosen by the parties to a contract, courts should give great weight to the practical construction placed upon the contract's terms by the parties themselves in the course of their performance. *Sam Macri & Sons, Inc. v. U.S.A. Co.*, 313 F.2d 119, 124 (9th Cir. 1963); 3 A. Corbin, Contracts, sec.

---

in Rev. Rul. 76–266, 1976–2 C.B. 10 (renegotiated subsequent lease terms will not be "tacked" for purposes of applying the 50-percent rule of sec. 46(e)(3)(B)).

[6] As both parties point out on brief, the holding in *Stewart v. United States*, an unreported case (D. Neb. 1977, 40 AFTR 2d 77–5735, 77–2 USTC par. 9648) was cited approvingly in *Xerox Corp. v. United States*, an unreported case (Trial Div. Ct. Cl., July 2, 1980, 46 AFTR 2d 80–5260, at 80–5266, 80–2 USTC par. 9530, at 84,721). However, we do not give much weight to the report in *Xerox* which, at this point, is only the recommended decision of the trial judge in the case and does not necessarily represent the opinion of the Court of Claims. See Rules Ct. Cl. 134.

558, at 249 (1960); 4 W. Jaeger, Williston on Contracts, sec. 623, at 789 (3d ed. 1961). In other words, the District Court took actual use into consideration *in construing the lease entered into* by the taxpayer. Indeed, this general principle of contract law explains why the Court of Appeals for the Ninth Circuit, which affirmed both the holding and the reasoning of this Court in *World Airways, Inc. v. Commissioner, supra,* added the comment:

> We feel that if World Airways had in fact used the [equipment for its own purposes], then possibly we would be persuaded to join Judge Lumbard [dissenting] in defining the lease as "casual or short term" and to allow World Airways the investment credit. [564 F.2d at 888.]

For the above reasons, we will look to the lease entered into by the parties, rather than unforeseeable subsequent events, to determine whether or not petitioner's White truck was leased for less than 50 percent of its useful life.

On this score, petitioner argues the lease should be viewed as a short-term lease because either party could terminate the lease without cause upon 30 days' written notice. Petitioner contends the lease was, in effect, merely a month-to-month lease under which neither party was unconditionally obligated to perform beyond the 30-day notice period. Respondent, on the other hand, argues the lease cannot be viewed as a short-term lease because it was an open-ended agreement with no set termination date. Although we recognize the issue is a close one, we hold for respondent.

Both parties cite and discuss a number of cases involving a mining lessee's entitlement to percentage depletion which tend to show a difference of legal opinion on the "length" of a lease which can be canceled without cause by one or both parties.[7] While those cases shed some light on the issue herein, they are for the most part inapposite because the term of the lease is but one of many factors which determine whether percentage depletion is available to a lessee. See *United States v. Swank,* 451 U.S. ___ (1981); *Paragon Coal Co. v. Commissioner,* 380 U.S. 624, 633–634 (1965). The question in this case is more limited.

---

[7]Compare, e.g., *Swank v. United States,* 221 Ct. Cl. 246, 602 F.2d 348 (1979) (lessee's depletion deduction), cert. granted 446 U.S. 934 (1980), with *Winters Coal Co. v. Commissioner,* 57 T.C. 249 (1971), revd. 496 F.2d 995 (5th Cir. 1974). See also *Whitmer v. Commissioner,* 443 F.2d 170 (3d Cir. 1971).

Under section 46(e)(3)(B), a noncorporate, purchasing lessor is allowed an investment credit *"only if * * * the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property."* (Emphasis added.) On brief, respondent implicitly suggests that we construe the options to cancel in petitioner's lease as "options to renew." We reject such an interpretation of either the lease or the statute.[8] Neither party to the lease in this case had an enforceable right to extend or renew the lease. Instead, the lease was self-extending unless one or both of the parties bailed out. Respondent is, therefore, correct in his assertion that the term of the lease was indefinite.[9] Even if we accept petitioner's argument that he had only a month-to-month lease with Sea-Land, we still cannot say that the term of the lease was less than 3 years. The lease had, of course, the potential for termination within that period, but there was no way to tell at the outset whether termination would in fact ever occur. It would have been a simple matter to include a maximum termination date in the contract, and any term of less than 3 years would have sufficed. However, the lease does not so provide nor does any other evidence in the fully stipulated record even remotely suggest that the parties realistically contemplated termination within 3 years. Thus, petitioner has failed to show that the lease satisfied the requirements of the statute.

Petitioner, however, argues he is entitled to an investment credit because he comes within the intent of the statute. Petitioner contends he really was in business for himself and did not buy his truck as a tax shelter. On brief, respondent concedes, "petitioners retained the financial risk and economic burden of

---

[8]We note two points in passing: First, we recognize that a *unilateral* option to cancel is not very different from an option, to renew. The holder of a unilateral option to cancel can extend the terms of a contract simply by not canceling, just as the holder of an option to renew can always cancel simply by not exercising his option.

Second, sec. 46(e)(3)(B) appears to apply if *either* party has an option to renew. Compare sec. 178(a) and (c) (options to renew exercisable by lessee); sec. 425(h)(1) (renewal or extension of employee's stock option by employer); sec. 542(d)(1)(B)(i) (borrower's option to renew or extend loan); sec. 1055(c)(1) (lessee's option to renew); sec. 1250(b)(2)(A) (lessee's option to renew). In doing so, the statute seems somewhat broader than its purpose. Where only the lessee has an option to renew, the lessor is periodically subject to the very real and substantial economic risk that the lessee will not renew.

[9]Moreover, the performance of the parties under the lease contract reveals that the words which define the duration of the lease mean just what they seem to say. The lease was intended to run for the truck's useful life, which was unexpectedly terminated in this case by calamity.

their investment." Nonetheless, respondent maintains petitioner failed to satisfy the statute's technical terms. We agree with respondent.

In drafting section 46(e)(3)(B), Congress could have chosen a rule based upon the benefits and burdens of ownership in light of all the relevant facts and circumstances. (See, e.g., *Swift Dodge v. Commissioner*, 76 T.C. 547 (1981)). But they did not. Instead, Congress decided to impose two hard-and-fast tests, one of which petitioner herein has failed. In effect, Congress chose a more easily administered approach (which, for taxpayers, provides predictability) and sacrificed some small measure of perfect equity. Not only was this choice at least arguably reasonable, it is not for us in any case to pass upon the wisdom of legislation. *Nebbia v. New York*, 291 U.S. 502, 537–538 (1934). See also *Commissioner v. Kowalski*, 434 U.S. 77, 95–96 (1977).

Accordingly, because the term of the lease was indefinite, section 46(e)(3)(B) denies petitioner an investment credit for the White truck.

To reflect concessions and the foregoing,

*Decision will be entered for the respondent.*