FRANK W. CORKERY AND ELIZABETH M. CORKERY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Corkery v. Commissioner
Docket Nos. 4868-84, 4869-84, 4870-84.
United States Tax Court
T.C. Memo 1985-311; 1985 Tax Ct. Memo LEXIS 328; 50 T.C.M. (CCH) 228; T.C.M. (RIA) 85311; June 25, 1985. Maris Baltins, for the petitioners. Thomas N. Tomashek and Henry Thomas Schafer, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS *329 OF FACT AND OPINION FEATHERSTON, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Frank W. Corkery and Elizabeth M. Corkery
Docket No. 4868-84 Addition to Tax
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
1975
$ 183
$ 9
1976
$ 6,670
$ 334
1978
$21,716
$1,086
1979
$22,915
$1,146
James A. Fish and Mikell F. Fish
Docket No. 4869-84 Addition to Tax
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
1975
$ 1,435.11
$ 71.76
1976
$ 4,254.00
$ 212.70
1978
$ 6,432.41
$ 321.62
1979
$27,352.97
$1,367.65
Robert A. Murphy and Constance M. Murphy
Docket No. 4870-84 Addition to Tax
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
1978
$ 1,865
$ 93
1979
$15,959
$798
Respondent has conceded the section 6653(a) [2] additions to tax and the parties have settled other issues by agreement. The only issue for decision is whether petitioners are entitled, under section 46(e)(3), to investment tax credits with respect to motor vehicles purchased *330 and leased by C. F. & M. Leasing, a partnership in which petitioners were partners. All of the facts are stipulated. On May 19, 1977, petitioners Frank W. Corkery (Corkery), James A. Fish (Fish), and Robert A. Murphy (Murphy), all residents of Spokane, Washington, when their petitions were filed, executed a partnership agreement and thereafter, as partners, engaged in the business of leasing motor vehicles under the name of C.F. & M. Leasing (the partnership). Profits and losses from the partnership exceeding their initial capital contributions were shared equally. Murphy served as managing partner. In 1978 and 1979, the partnership invested the following sums for the acquisition of motor vehicles which it leased to others: 1978
1979
New Vehicles
$797,772
$680,075
Used Vehicles
45,944
Total
$843,716
$680,075
Between May 19, 1977, and December 31, 1979, the partnership leased 400 vehicles pursuant to standard lease forms. Under the terms of the standard lease used by the partnership, the lessee agreed to lease a vehicle with *331 a stated original value for a prescribed term, to make a "total delivery payment," and to make monthly payments in agreed amounts. The monthly payments included amounts designated as depreciation, rental insurance, licenses, tax, and miscellaneous. On stated conditions, a lease could be terminated by either party and the vehicle returned to the partnership. Upon the termination of a lease, whether by agreement or on its expiration, the lessee agreed to make all monthly payments then due, and the partnership agreed to sell the vehicles at public or private sale. If the net proceeds of the sale were less than the depreciated value of the vehicle, the lessee was required to pay the difference to the partnership. If the net proceeds exceeded the depreciated value, the partnership was required to pay the difference to the lessee. [3]
*332 None of the partners had any previous experience in leasing motor vehicles except Murphy who had worked as a salesman for a leasing company. The partners relied on the advice of a certified public accountant in claiming depreciation deductions and investment tax credits with respect to the vehicles used in the partnership business. On the advice of the accountant, the partnership set up its depreciation schedule using a pooling arrangement rather than an individual vehicle basis. On its returns for 1978 and 1979, the partnership claimed depreciation deductions computed by using a 7-year useful life for the leased vehicles. The partnership returns attached schedules K-1 showing the proportionate invested amounts for each of the petitioner-partners. They used such amounts in claiming the investment tax credits here in dispute. [4]
*333 In the notices of deficiency issued to petitioners, respondent disallowed the claimed investment tax credits on the ground that the leases did not meet the requirements of section 46(e) in that petitioners failed to show that the lease terms were less than 50 percent of the useful lives of the motor vehicles. [5]
Section 38 allows a credit against tax for investments in certain depreciable property. Section 46(e)(3) prescribes the following investment tax credit limitation with respect to noncorporate lessors:
*334 A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if-- (A) the property subject to the lease has been manufactured or produced by the lessor, or (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property * * *. [6]
See also sec. 1.46-4(d), Income Tax Regs.
The principal legislative purpose of section 46(e)(3) was to limit the use by individuals of investment tax credits to finance the acquisition and leasing of depreciable property as tax shelters. S. Rep. No. 92-437, 1972-1 C.B. 559, 583. The objective was to make such credits available only to those noncorporate lessors actually using the property in an active business-- lessors who had themselves manufactured or produced the property, and short-term lessors. *335 To exclude long-term lessors, section 46(e)(3)(B) denies an investment credit to a noncorporate lessor where the lease term, including options to renew, equals or exceeds 50 percent of the property's useful life. Ridder v. Commissioner,76 T.C. 867, 872 (1981). Although directed primarily at tax shelters, the tests prescribed by the section must be met by all noncorporate taxpayers claiming the credit. In Hokanson v. Commissioner,730 F.2d 1245, 1250 (9th Cir. 1984), affg. a Memorandum Opinion of this Court, the Court of Appeals commented on section 46(e)(3) as follows: Congress chose two hard-and-fast tests, sacrificing some degree of equity for predictability and ease of administration. Where * * * the taxpayers do not meet the literal requirements of the Code, the credit should be denied. * * * The parties here agree that the partnership did not manufacture or produce the motor vehicles that it leased and that it leased the vehicles as a bona fide business, not as a tax shelter. The issue is whether the 50-percent test has been met. Contending that they meet the requirements of section 46(e)(3)(B), petitioners maintain that the leased vehicles *336 had a useful life of 7 years, that the leases did not have terms longer than 3-1/2 years, and that, therefore, the leases were for terms less than 50 percent of the useful life of the leased vehicles. The application of section 46(e)(3)(B) requires a comparison of the terms of the leases with the useful life of the motor vehicles to ascertain whether the 50-percent test has been met. Petitioners must show that they realistically contemplated that the leases would terminate prior to the expiration of one-half of the useful life of the motor vehicles. Hokanson v. Commissioner,supra.The crucial issue here is the useful life of the vehicles. The determination of their useful life must be made in the light of the conditions that existed in the year the vehicles were first leased and placed in service. Hokanson v. Commissioner,730 F.2d at 1247, 1248; Ridder v. Commissioner,76 T.C. at 872-873; Bloomberg v. Commissioner,74 T.C. 1368, 1372 (1980). Hindsight may not be used as a guide in making this determination. *337 Western Terminal Co. v. United States,412 F.2d 826, 827 (9th Cir. 1969); Casey v. Commissioner,38 T.C. 357, 381 (1962). [7]
In determining the useful life of property for investment tax credit purposes, we look for guidance to section 167 relating to the allowance of the deduction for depreciation. [8] That section does not define the term useful life. The regulations provide, however, that the term useful life is not the total physical life of the property, but only "the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income." Sec. 1.167(a)-1(b), Income Tax Regs. The regulation further provides: *338 This period shall be determined by reference to his [the taxpayer's] experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * *339 As explained in Massey Motors, Inc. v. United States,364 U.S. 92 (1960), which involved an automobile rental business, some assets are acquired with the intent to use them for a shorter period than their full economic or physical life. The objective of the statute is to arrive at a depreciation rate that will reflect the actual cost of the asset--the original cost minus the salvage value--over the period that it is useful in the taxpayer's business. To achieve this objective, the Court explained (364 U.S. at 107) that the useful life of an asset is "related to the period for which it may reasonably be expected to be employed in the taxpayer's business." See also Hertz Corp. v. United States,364 U.S. 122 (1960). Of 400 leases made by the partnership prior to December 31, 1979, 44 (11 percent) were for terms of 24 Months, 335 (84 percent) were for terms of 36 months, and 21 (5 percent) were for other terms. They all contained the standard resale provisions quoted in footnote 3, supra.These resale provisions reflect a partnership policy, within the meaning of the above regulation ( sec. 1.167(a)-1(b), Income Tax Regs.), that *340 the motor vehicles would be disposed of on the expiration or termination of the leases. The leases provided no other way for final settlement with the lessees. Because the useful life of property for depreciation and investment tax credit purposes is "related to the period for which it may reasonably be expected to be employed in the taxpayer's business," Massey Motors, Inc. v. United States,364 U.S. at 107, the partnership's leases, given the resale provisions, could not have had terms "less than 50 percent of the useful life" of the motor vehicles as required by section 46(e)(3)(B). See Fredricks v. Commissioner,T.C. Memo. 1983-725. We are aware that the regulations provide the general rule that "[t]he asset depreciation period * * * shall be determined without regard to the period for which such property is leased, including any extensions or renewals of such period." Sec. 1.167(a)-11(e)(3)(iii), Income Tax Regs. In this case, however, the leases expressly provided for the sale of the leased vehicles when the leases were terminated or expired. The leases themselves measured the period the automobiles were reasonably expected to be useful *341 in the partnership's business. The useful life of each vehicle in the hands of the partnership was thus tied directly to the term of the lease. The partnership's actual cost of using the vehicles during the period it leased them could be measured only be allowing depreciation deductions related to this anticipated period of use. See Fredricks v. Commissioner,supra.
Petitioners assert that the partnership "sought to re-lease and/or sell the vehicle at the most favorable economic result to itself at the time" and argues that there "was no policy and practice to dispose of its rental vehicles as soon as possible after termination of the initial lease term." This assertion is inconsistent with the plan of operations contemplated by the lease provisions quoted in footnote 3. It is supported by no evidence other than possibly, to some extent, some schedules, attached to the stipulation as exhibits, showing the dates of the leases, the lessees, the terms of the lease, date of disposal, and other items of information not pertinent here. These schedules are not explained in any detail by any testimony, the stipulation, or the briefs filed by petitioners. As we *342 understand the schedules, they cover the partnership's 1977, 1978, and 1979 leases from the dates of their execution through December 12, 1983. They show that approximately 33 percent of the motor vehicles were re-leased notwithstanding the resale provisions. [9] As we analyze the schedules, however, the vast majority of these transactions involved re-leases to the original lessees [10] and, as a general rule, an original lease and a renewal thereof must be regarded as one lease for the purposes of section 46(a)(3)(B). Section 1.46-4(d)(4), Income Tax Regs., expressly provides: If a noncorporate lessor enters into two or more successive leases with respect to the same or substantially similar items of section 38 property, the terms of such leases shall be aggregated and such leases shall be considered one lease for the purpose of determining whether the term of such leases is less than 50 percent of the estimated useful life of the property subject to such leases. Thus, for example, if an individual owns an airplane with an estimated useful life of 7 years and enters into 3 successive 3-year leases of such airplane, such leases will be considered to be one lease for a term of nine *343 years for the purpose of determining whether the term of the lease is less than 3-1/2 years (50 percent of the 7-year estimated useful life). This regulation was clearly intended to prevent circumvention of the 50-percent test. The renewals of the leases by the partnership thus had only the effect of extending the period petitioners were required to show as the useful life of the motor vehicles. [11] Even in a lease renewal situation, therefore, if the vehicle were sold on the termination of the lease, the 50-percent test could not be met. *344 Petitioners assert that "not all of the vehicles were re-leased to the initial customer" and that "there were numerous leases of used vehicles to new and different customers." To support these assertions, petitioners refer to another substantially unexplained exhibit to which are attached leases covering 11 vehicles. To four of these leases are attached assignments from one lessee to another individual or corporation, acceptances by the assignees, and, in each case, a "consent of lessor" signed on behalf of the partnership. These assignment and assumption agreements, in our view, must be regarded as continuations of the original leases, not as new leases; otherwise, such an assignment and assumption procedure would provide an easy method for circumventing the 50-percent test prescribed by section 46(e)(3). The other seven leases are not sufficient to reflect a partnership policy of retaining ownership of once-leased vehicles for subsequent rental purposes. [12]
*345 Petitioners state that, in May 1977, their business was a new one, and they had no experience on which to base an estimate of the useful lives of their leased vehicles. [13] They argue: When they started their business in 1977, the petitioners were free to select either a three or seven year useful life. For that matter, they could have followed Bulletin F and used a 15 year useful life and still have been within the guidelines issued by the Internal Revenue Service. This is so because the petitioners at that time had no prior experience with leased vehicles. It is true, as a general rule, that depreciation deductions claimed on a return "will be changed only where there is a clear and convincing basis for a change." Sec. 1.167(b)-0(a), Income Tax Regs., quoted in part in footnote 7, supra. Because of the resale provisions of the partnership's standard lease, however, petitioners could have easily determined from the very beginning of the partnership venture what the useful life of the vehicles would be in the business. No hindsight is required. *346 It is not sufficient for petitioners to assert that they relied on the advice of an accountant who had represented other leasing companies in claiming a 7-year useful life for their vehicles. The accountant did not testify as a witness and the record does not show whether other leasing firms followed the same policies as the partnership in leasing their vehicles and selling them on the termination or expiration of the leases. This linkage between the terms of the leases and the periods during which the vehicles were expected to be used in the partnership business precludes compliance with the 50-percent test prescribed by section 46(e)(3)(B). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. The following cases are consolidated herewith: James A. Fish and Mikell F. Fish, docket No. 4869-84, and Robert A. Murphy and Constance M. Murphy, docket No. 4870-84.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
3. The standard lease form defines the term "depreciated value" as "Original Value, less a sum equal to its Monthly Depreciation as specified herein, multiplied by the number of Monthly Rentals that have been paid" and contains the following provisions on resale: e. Resale. Upon return or repossession of the Vehicle, Lessor shall sell the same as provided in paragraph 13b, and, if Net Proceeds are less than Depreciated Value, Lessee shall pay the difference to Lessor; if Net Proceeds exceed Depreciated Value, Lessor shall pay the difference to Lessee, subject to provisions of paragraph 13 below. (i) "Net Proceeds" shall mean the amount received on the sale, less all direct expenses of Lessor in preparing and holding the vehicle for sale and selling it and less all sums due Lessor under paragraph 12d if not otherwise paid, and less all debts incurred by Lessee which, if not paid, might constitute a lien on the vehicle or a liability of Lessor. * * * b. Resale. If the Lessor does not request Lessee to purchase the vehicle or if the vehicle is not so purchased, or if this lease is terminated by Lessee under paragraph 11b, Lessor shall sell the vehicle (or wreckage under paragraph 12c) within 30 days after its surrender or repossession (or such other period as the parties may agree upon). The sale may be public or private and with or without notice to Lessee, shall be at wholesale, and shall be only for cash payable in full upon delivery of the vehicle and its title papers to the purchaser. If the Net Proceeds of the sale are less than the Depreciated Value of the vehicle such deficiency shall constitute part of Lessor's damages; if such Net Proceeds exceed Depreciated Value, the excess shall constitute an offset to Lessor's other damages. The partnership used another lease form in some of its transactions. The other form was similar in principle.In their reply brief, petitioners state that the lease form described in the text was used for business leases and the other form was used for consumer leases and add: "Petitioners dealt with their customers as if the rights and obligations under both leases were identical on termination."↩
4. Sec. 1.46-3(f)(1), Income Tax Regs., provides: (f) Partnerships--(1) In general. In the case of a partnership, each partner shall take into account separately, for his taxable year with or within which the partnership taxable year ends, his share of the basis of partnership new section 38 property and his share of the cost of partnership used section 38↩ property placed in service by the partnership during such partnership taxable year. * * * The estimated useful life to each partner of such property shall be deemed to be the estimated useful life of the property in the hands of the partnership. * * *
5. The notices of deficiency did not alter the depreciation deduction claimed by the partnership. In the opinion of the revenue agent, the information necessary for a change in the amount of the deduction was not made available and available information indicated that, due to the method used by the partnership, changing the useful life of the motor vehicles used by the partnership would not substantially affect the amount or timing of the deduction. The parties have stipulated: The petitioners are entitled to use the useful life for depreciation purposes as finally determined by this court for investment tax credit purposes for the years currently before the court.↩
6. This subparagraph (B) of sec. 46(e)(3)↩ imposes a further related requirement that the sum of the allowable deductions for the first 12 months after the transfer must exceed 15 percent of the rental income produced by the property. This requirement, the parties agree, has been met.
7. Sec. 1.167(b)-0(a), Income Tax Regs., provides: The reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist at the end of the period for which the return is made. It is the responsibility of the taxpayer to establish the reasonableness of the deduction for depreciation claimed. Generally, depreciation deductions so claimed will be changed only where there is a clear and convincing basis for a change.↩
8. Sec. 46(c)(2) provides: (2) Applicable percentage in certain cases.--Except as provided in * * * [certain paragraphs not relevant here], the applicable percentage * * * [for investment tax credit purposes], for any property shall be determined under the following table: If the useful life is-- The applicable percentage is-- 3 years or more
but less than 5 years
33-1/3 5 years or more
but less than 7 years
66-2/3 7 years or more
100
For purposes of this subpart, the useful life of any property shall be the useful life used in computing the allowance for depreciation under section 167 for the taxable year in which the property is placed in service.↩
9. Based on an analysis of the stipulated exhibits, respondent requested the following table be included ind the findings of fact and petitioners made no objection thereto: ↩
Year
No. of Leases
Yearly Percent
(By Date Leased)
Renewed
Re-leased
1977
60
52%
1978
44
26%
1979
26
23%
Total/Average
130
33%
10. The standard lease form used by the partnership contains the following provision: Either Lessor or Lessee may, at least thirty (30) days, but not more than ninety (90) days, prior to the expiration of this lease, offer in writing to the other to continue this lease indefinitely on a month-to-month basis. If the other accepts such offer in writing this lease shall be so continued with respect to the Vehicle. ↩
11. Rev. Rul. 76-266, 1976-2 C.B. 10, reasons that "The credit was intended to be allowed with respect to the property leased for terms that are short in comparison to the useful life of the property because the lessor thereby retains active business risks, rather than solely passive financing risks, with respect to the predominant portion of the useful life of the property" and states that the regulation ( sec. 1.46-4(d)(4), Income Tax Regs.) may not apply where successive leases are not interrelated and are independently negotiated. In such circumstances, the ruling reasons, the lessor retains normal active business risks with respect to the predominant portion of the useful life of the property. Cf. Ridder v. Commissioner,76 T.C. 867, 872-873↩ (1981). Petitioners offered no evidence to show that they come within this ruling.
12. As indicated, the record is skimpy with respect to these 11 leases but they appear to involve situations in which the partnership repossessed leased vehicles, voluntarily or by agreement, and then leased them to other individuals. A revenue agent's report, stipulated in evidence, states that: "On rare↩ occasions, a vehicle has been repossessed and re-leased, but that is an exception, and should not be counted on deciding useful life upon acquisition." We agree. Such repossessions were not contemplated when the vehicles were placed in service.
13. Petitioners acknowledge that the guidelines for depreciation published in 1962 (Rev. Proc. 62-21, 1962-2 C.B. 418, 419) lists 3 years as the useful life of automobiles, as does the Asset Depreciation Range system published in 1972 (Rev. Proc. 72-10, 1972-1 C.B. 721↩). They state, however, that these listings are "merely guidelines that were elective on the part of the taxpayer."