DONALD G. McNAMARA and VALERIE J. McNAMARA; ROBERT F. CHRISTIANSEN and LUCILLE L. CHRISTIANSEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McNamara v. Commissioner
Docket No. 2612-84.
United States Tax Court
T.C. Memo 1986-300; 1986 Tax Ct. Memo LEXIS 313; 51 T.C.M. (CCH) 1464; T.C.M. (RIA) 86300; July 21, 1986. John F. Emanuel, for the petitioners. Sheldon M. Kay, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACTS AND OPINION WRIGHT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Deficiencies
Year
Donald G. and
Robert F. and
Valerie J. McNamara
Lucille L. Christiansen
1977
$2,804.00
$2,804.00
1978
7,307.00
7,307.00
1979
6,300.00
6,811.00
Petitioners dispute respondent's *314 denial of investment tax credits to D & B Associates ("D & B"), a general partnership. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by reference. Petitioners Donald G. McNamara ("McNamara") and Valerie J. McNamara resided in Whitefish Bay, Wisconsin, when the petition herein was filed. Petitioners Robert F. Christiansen ("Christiansen") and Lucille L. Christiansen resided in Glendale, Wisconsin, when the petition herein was filed. McNamara and Christiansen will hereinafter sometimes be referred to as "petitioners." F.J.A. Christiansen Roofing Co., Inc. ("Roofing") operated as a roofing contractor during the years in issue. At that time the stock of Roofing was owned as follows: Voting Class A
Nonvoting Class B
Preferred
Stockholder
Common Stock
Common Stock
Stock
Donald McNamara
50%
39%
0  (petitioner)
Robert F. Christiansen
33.8%
5%
0  (petitioner)
Christiansen Family
16.2%
56%
0  Trust
Joyce Church
0  0 100%
Totals
100%
100%
100%
Joyce Church is Christiansen's sister. During *315 the years in issue, the preferred stock of Roofing was nonvoting. Christiansen exercised the voting rights for the stock held by the Christiansen Family Trust. Neither Donald G. McNamara nor Valerie J. McNamara is related to either Robert F. Christiansen or Lucille L. Christiansen. McNamara is the president and treausrer of Roofing and Christiansen is the vice president and secretary. During the years in issue the board of directors of Roofing had four members: McNamara, Christiansen, Joyce Church, and one outside director who was an officer of the Marine National Exchange Bank. In late 1967, Roofing needed additional equipment in order to operate its roofing business competitively. It had a low net worth and limited working capital, however, and at that time it did not want to incur additional indebtedness because excessive liabilities on its balance sheet would limit its ability to obtain the bid bonds necessary to bid on projects and would jeopardize operations by impairing its available working capital. In response to this situation, Roofing's board of directors decided to lease the needed equipment. It considered leasing the equipment from another entity but found that *316 the cost would be prohibitive. Therefore, early in 1968 McNamara and Christiansen formed a leasing partnership, D & B Associates ("D & B"), in which they each owned a one-half interest. Thereafter, Roofing fulfilled approximately 40 percent of its equipment needs by leasing from D & B. Another reason for the formation of D & B was McNamara's and Christiansen's desire to acquire assets which would be insulated from the risks of the construction business. In addition to leasing equipment, D & B owns real estate which it leases to a related company and has invested in stock and in partnerships involved in oil and gas activities. During the years here in issue, D & B leased the following items to Roofing: a 1977 Mack truck, a 1978 Mack truck, a Toshiba copier model 702A, a 1979 25-ton Grove hydraulic truck crane, and a 1979 35-ton P & H hydraulic truck crane. The above assets were neither manufactured nor produced by D & B, but were purchased by it to meet the needs of Roofing. D & B paid the purchase price of each of these assets and took legal title and, where necessary, registration in its name. However, the purchase orders and price quoations for the 1979 35-ton P & H hydraulic *317 truck crane, the 1978 Mack truck, and the 1977 Mack truck were in Roofing's name. The equipment purchased by D & B and leased to Roofing was not unique, but was of the type commonly used by construction companies and could have been leased or sold by D & B to other construction contractors. However, D & B does not lease equipment to anyone but related corporations. The acquisition of major pieces of construction equipment requires substantial lead time. For example, it can take six to nine months from the time of placing an order for a crane to the date of delivery. Here, when a purchase order and price quotation were issued for a particular piece of equipment, it was often not decided whether D & B or Roofing would actually purchase the equipment. That decision was made later and was based on their relative financial positions. With respect to each of the assets at issue, the original written lease document provided that the term of the original lease was a period of less than 50 percent of the useful life of the respective asset and contained a fixed date of termination without an option to renew. Four of the five original leases were renewed. With respect to the property *318 which was the subject of the fifth lease, a subsequent lease was entered into between a partnership related to D & B and a subsidiary of Roofing. The renewal leases were not negotiated simultaneously with the original lease, but upon the expiration of the existing lease. The details of the original and subsequent leases are as follows: On January 21, 1977, D & B acquired a 1977 Mack truck with an economic useful life of 8 years. D & B entered into the following leases with Roofing with respect to the truck: Date of Lease
Stated Lease Term
February 1, 1977
29 months
July 1, 1979
12 months
July 1, 1980
12 months
July 1, 1981
12 months
At the time of trial, the truck was still being leased by D & B to Roofing under a lease which was entered into on July 1, 1984, for a term of 12 months. All the material provisions of the aforementioned leases are identical with the following exceptions: a. The monthly rent was reduced after 36 months from $1,680 per month to $1,090 per month; b. The lease dated February 1, 1977, provided that the lessee was to pay all expenses except that the lessor was to reimburse the lessee for expenses not to exceed $3,100. *319 The lease dated July 1, 1979, provided that the lessor was to pay all expenses, while the lease dated July 1, 1980, provided that the lessee was to pay all expenses; and c. The initial lease, dated February 1, 1977, contained an option in favor of the lessee to purchase the equipment. This option was not contained in any subsequent lease. On March 31, 1977, D & B acquired a Toshiba copier model 702A with an economic useful life of 8 years. D & B entered into the following leases with Roofing with respect to the copier: Date of Lease
Stated Lease Term
April 1, 1977
24 months
April 1, 1979
12 months
April 1, 1980
12 months
April 1, 1981
12 months
There is no evidence of any lease between D & B and Roofing with respect to the copier after March 31, 1982. All of the leases provided that the lessee was obligated to provide insurance for the copier and to maintain the copier in good working condition. All of the material provisions of the aforementioned leases are identical with the following exceptions: a. The monthly rent was reduced from $120 a month to $80 a month in the April 1, 1980 lease; and b. The lease dated April 1, 1977, provided *320 that the lessor was to pay expenses, not to exceed $225, for the first 12-month period. The lessee was required to pay the remaining expenses for such period. The subsequent leases provided that the lessee was to pay all expenses. On January 10, 1978, D & B acquired a 1978 Mack truck with an economic useful life of 5 years. D & B entered into the following leases with Roofing with respect to the truck: Date of Lease
Stated Lease Term
February 1, 1978
29 months
July 1, 1980
12 months
July 1, 1981
12 months
At the time of trial, the truck was still being leased by D & B to Roofing under a lease which was entered into on July 1, 1984, for a term of 12 months. All of the material provisions of the aforementioned leases are identical with the following exceptions: a. The monthly rent was reduced from $1,140 per month to $741 per month after 36 months; b. The lease dated February 1, 1978, provided that the lessee was to pay for all expenses except that the lessor was to reimburse the lessee for expenses not to exceed $2,100, while the leases entered into on July 1, 1980, and July 1, 1981, provided that the lessor was to reimburse the lessee for all *321 expenses of license fees, insurance, repairs, and maintenance; and c. The initial lease contained an option in favor of the lessee to purchase the equipment. This option was not contained in any subsequent lease. On March 29, 1979, D & B acquired a 1979 35-ton P & H hydraulic truck crane with an economic useful life of 10 years. D & B entered into a lease with Roofing with respect to that crane dated April 1, 1979, for a term of 40 months. At the time of trial the crane was still being leased by D & B to Roofing under a lease which was entered into on August 1, 1984, for a term of 12 months. The leases provide that the lessee is to pay all expenses except that within the first 12 months of operation the lessor was to pay the expenses, not to exceed $6,500. Under the initial lease dated April 1, 1979, the rent was $3,400 per month, whereas the rate in the subsequent lease dated August 1, 1984, was $2,200 per month. On October 1, 1978, D & B acquired a 1979 25-ton Grove hydraulic truck crane with an economic useful life of 10 years. On the same day, D & B and Roofing entered into a lease agreement with respect to that crane for a stated term of 40 months. It was subsequently *322 determined that the Grove crane was better suited to the operations of Roofing's wholly owned subsidiary, F.J.A. Christiansen Corp. Therefore, approximately six months after it was acquired, the Grove crane was distributed by D & B to its partners who then contributed it to D & BJ Associates as a contribution to capital. D & BJ Associate (also known as DB & J Associates and BD & J Associates) is a partnership whose partners are Donald McNamara, Robert Christiansen, and James McNamara (Donald's brother). Each partner has a one-third interest in the partnership with respect to the Grove crane. On March 15, 1979, D & BJ Associates and F.J.A. Christiansen Corp. entered into a lease agreement with respect to the Grove crane for a term of 40 months. There is no evidence as to whether, at the time of trial, the Grove crane was still being leased to F.J.A. Christiansen Corp. The lease agreement for the Grove crane between D & BJ Associates and F.J.A. Christiansen Corp. contained a provision requiring D & BJ Associates to pay up to $5,000 of section 162 expenses for the "first 12-month lease period." For the time during which it leased the 1979 25-ton Grove crane to Roofing, D & B *323 paid $1,026 of the section 162 expenses of that crane, by means of an entry to an inter-company account receivable and account payable. D & B did not pay any other section 162 expenses with respect to this asset. For the 12-month period beginning on the date on which this crane was transferred to D & BJ Associates, D & BJ Associates incurred a total of $5,000 of the section 162 expenses of this crane. This amount was paid by D & BJ Associates, by check dated March 18, 1980. For the period of time during which it leased the Grove crane to Roofing, D & B received rental income in the total amount of $20,400. For the remainder of the first 12-month period after the Grove crane was initially placed in service (March 1979 through September 1979) D & BJ Associates received rantal income in the total amount of $18,200. Except with respect to the 1979 25-ton Grove crane, petitioners paid section 162 expenses in excess of 15 percent of the rental income received from each of the leased assets at issue herein during the first 12 months of the operation of each asset. Except as described above, neither D & B nor D & BJ Associates paid any section 162 expenses after the first 12 months *324 of operation for any of the 5 aforementioned assets. McNamara has degrees in both business administration and in law. Petitioners were advised as to and were aware of the tax aspects of the leasing arrangements before entering into the leases which are the subject of this case. During the years in issue, D & B entered into several agreements with Marine National Exchange Bank to borrow funds. These agreements state that such funds are to be used "for the purpose of financing equipment leased to the F.J.A. Christiansen Roofing Co., Inc. * * * or any of its subsidiaries." The agreements further required that Donald McNamara and Robert Christiansen remain in principal management positions of Roofing for the term of the loan agreements, except in the event of the death or incapacity of either of them. During the years in issue D & B claimed investment tax credit based on the five assets described above, all of which qualify as section 38[1] property. On their Federal income tax returns for those years petitioners, as partners of D & B, claimed their share (50 percent each) of this credit. Respondent denied these credits to petitioners. *325 OPINION The sole issue presented is whether petitioners, as partners in D & B, are entitled to investment tax credits for equipment purchased by the partnership and leased to a related corporation. The respondent's determination in his statutory notice of deficiency to disallow the investment tax credit is presumptively correct, and petitioners have the burden of proving otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Section 38 allows a credit against tax for investments in certain depreciable property in an amount determined under section 46. However, section 46(e)(3) limits the availability of the credit with respect to noncorporate lessors. That subsection provides in pertinent part: (3) Noncorporate Lessors. -- A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if -- (A) the property subject to the lease has been manufactured or produced by the lessor, or
*326 (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property. As this Court explained in Ridder v. Commissioner,76 T.C. 867 (1981), "[s]ection 46(e)(3) is a fairly technical provision which can best be understood in terms of its purpose. In general, Congress was concerned that individuals might be tempted to use investment credits to finance the acquisition and leasing of depreciable property as tax shelters." Ridder v. Commissioner,supra at 872. By establishing limitations on the availability of the investment credit, Congress intended to benefit only those noncorporate lessors actually using the section 38 property in an active business -- lessors who had manufactured or produced the property and *327 short-term lessors. Ridder v. Commissioner,supra at 872. At the same time, Congress intended to deny the investment credit to those purchaser-lessors who were involved merely in financing arrangements without undertaking the risks and obligations of an ongoing trade or business. Thus, for example, section 46(e)(3)(B) denies the credit to a noncorporate lessor where the lease term exceeds 50 percent of the useful life of the subject property. Ridder v. Commissioner,supra.
The property which was the subject of the leases under consideration here was not manufactured or produced by D & B. Thus, petitioners, as noncorporate lessors, must satisfy the requirements of subsection 46(e)(3)(B) in order to be entitled to the investment tax credit. With respect to each asset, these requirements are: (1) a lease term of less than 50 percent of the useful life of the property; and (2) section 162 expenses (other than rents and reimbursed amounts), with respect to the property, in excess of 15 percent of the rental income from the property for the first 12 months after the property is transferred to the lessee. For petitioners to prevail, they must *328 first show that the term of each lease was less than 50 percent of the useful life of the property. On its face, each of the original written lease documents specified a term of less than 50 percent of the useful life of the subject property. Respondent argues, however, that the facts presented herein reflect a reasonable certainty that the corporate lessee would continue leasing the properties from D & B for an indefinite period. He concludes, therefore, that the stated "terms" of the leases should be disregarded in determining the terms of the leases under section 46(e)(3)(B). Petitioners maintain, however, that they had entered into a binding written lease agreement with the lessee for each item of property, which agreements provide for definite, fixed terms and contain no option to renew and that, for purposes of section 46(e)(3)(B), the term of the lease is the term specified in the written lease agreement. The provisions of written documents are not necessarily conclusive for tax purposes. Highland Hills Swimming Club, Inc. v. Wiseman,272 F.2d 176 (10th Cir. 1959). *329 The substance, rather than the form, of any transaction is controlling. Commissioner v. Court Holding Co.,324 U.S. 331 (1945). Thus, applying these principles, it is clear that lease terms may be disregarded. Highland Hills Swimming Club, Inc. v. Wiseman,supra, and cases cited therein. All facts and circumstances that shed light on a transaction should be considered in deciding whether a lease is of indefinite duration rather than limited to the term stated in the lease agreement. Highland Hills Swimming Club, Inc. v. Wiseman,supra at 179; Buddy Schoellkopf Products, Inc. v. Commissioner,65 T.C. 640, 656 (1975). For purposes of section 46(e)(3)(B), the length of the lease term should be calculated in accordance with the "realistic contemplation" of the parties at the time the lease was entered into. Hokanson v. Commissioner,730 F.2d 1245, 1248 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; Ridder v. Commissioner,supra at 875. If there is a reasonable *330 certainty that the lessee will continue leasing the property beyond the period stated in the lease, the lease term is indefinite. [2]G.W. Van Keppel Co. v. Commissioner,295 F.2d 767, 770-771 (8th Cir. 1961), affg. a Memorandum Opinion of this Court; Standard Tube Co. v. Commissioner,6 T.C. 950, 955 (1946). [3]
The evidence shows that (1) equipment *331 was purchased by D & B to meet the needs of Roofing; (2) the costs of alternate leasing arrangements were found to be prohibitive; (3) D & B leased property only to related companies; and (4) there is common control of D & B and Roofing. The evidence shows that D & B purchased equipment in order to meet the specific operating needs of Roofing. Although the purchased equipment could have been used by other companies in the roofing industry, the property was selected not for its general marketability but according to the particular needs of Roofing. This tailoring of D & B's purchases to the needs of Roofing indicates that, at the time the original leases were entered into, the parties intended such leases to continue beyond their stated terms. [4] See Buddy Schoellkopf Products, Inc. v. Commissioner,65 T.C. 640, 657 (1975). The record also shows that Roofing explored the possibility of leasing equipment from other companies but found the cost to be prohibitive and, therefore, arranged to fulfill its equipment needs by leasing from D & B. It is not unreasonable to expect that the cost of leasing from *332 a non-related company would continue to be higher than the cost of leasing from D & B. Thus, it can be inferred that, at the time of entering into the subject leases, Roofing and D & B anticipated continuing such leases beyond their stated termination dates, for as long as Roofing needed the equipment. In addition, there is no indication that Roofing's reasons for leasing rather than purchasing the needed equipment, namely its desire to limit its balance sheet liabilities and to preserve capital, would change over time. Therefore, we do not believe that Roofing expected to exercise the option to purchase contained in some of the original leases, but intended to continue the lease agreements for as long as the equipment was needed. The evidence also shows that D & B leased equipment only to related parties. While this fact, standing alone, is not determinative, when considered with the entire record it suggests that it was within the contemplation of the parties that the leases would be continued on a long-term basis, past their termination dates. Finally, common control of the lessor and lessee is a factor to be considered in determining whether the stated term of a lease should *333 be disregarded. See G.W. Van Keppel Co. v. Commissioner,supra at 771-772; Highland Hills Swimming Club, Inc. v. Wiseman,supra at 180. [5] Here, petitioners owned or controlled all of the voting stock in Roofing, the lessee, and all of the partnership interests in D & B, the lessor. During the years in issue, petitioners served as the officers of Roofing and had the authority to make all managerial decisions. In fact, one of the conditions of the receipt by D & B of funds borrowed from Marine National Exchange Bank was the continued presence of petitioners in management positions. In negotiations concerning these leases petitioners were, in effect, dealing with themselves. Absent from this arrangement was the element of arm's-length bargaining typical of lease arrangements. [6]
*334 Upon consideration of the foregoing facts and of the entire record, we believe that respondent is correct in his determination that the leases here in question are of indefinite duration. Although the express terms of the original written lease documents were less than 50 percent of the useful life of the subject property, the record shows that the parties to those leases realistically contemplated that the leases would extend beyond the stated terms. It is clear that the parties intended and expected that the equipment which is the subject of the leases here under consideration would be leased to Roofing for as long as it met the needs of that company. We find that there is a reasonable certainty that Roofing will continue leasing the property beyond the stated lease terms and the terms are, therefore, indefinite. Thus, petitioners have failed to establish that the term of each of the leases herein is less than 50 percent of the useful life of the leased property. Because of our determination that the 50 percent test for use of the investment tax credit by a noncorporate lessor under section 46(e)(3)(B) has not been met, it is unnecessary to resolve whether petitioners have *335 met the 15 percent test under that section, with respect to the Grove crane. In support of their contention that the terms set forth in the written lease documents should control in determining the terms of the leases for purposes of section 46(e)(3)(B), petitioners argue that to hold otherwise would frustrate the intent of Congress because lessors who structured their leases in accordance with the requirements of the statute would be denied the investment credit. However, as discussed earlier in this opinion, Congress wanted to make the investment credit available to noncorporate lessors who were using the property in question in an active business. Ridder v. Commissioner,supra.These were determined to be, among others, short-term lessors. It was the intent of Congress to deny the credit to purchaser-lessors who were merely involved in financing arrangements. The fact that purchase orders were issued in Roofing's name and that price quotations and purchase orders were issued to Roofing on certain pieces of equipment which were then purchased by D & B, we believe indicates that the purchase and subsequent leasing by D & B was in fact a financing arrangement *336 and not the operation by D & B of a leasing business. A further indication is that, as between D & B and Roofing, the determination as to who would purchase a particular piece of equipment was based upon which one was financially better situated at the time of purchase. Thus, the evidence here shows that D & B and Roofing were involved in financing arrangements which were not intended by Congress to entitle the parties to investment credits. Petitioners maintain that underlying the leasing transactions here were real economic and business considerations and that although they were aware of the tax benefits resulting from their leasing activities, these activities were not primarily tax motivated. They conclude that because their transactions were not an intentional abuse of the investment credit provisions, such credits should not be denied. We accept as true McNamara's testimony that he and Christiansen had valid business reasons for forming D & B, in addition to their intent to lease equipment to Roofing. We do not require persons engaged in business activities to be ignorant of the tax consequences of those activities. Under the facts presented here, however, the presence *337 or absence of valid business reasons for entering into the instant leasing transactions is irrelevant. See Carlson v. Commissioner,79 T.C. 215, 225 (1982), affd. 712 F.2d 1314 (9th Cir. 1983). In any event, on the facts here presented we do not find that the subject leases were primarily tax motivated. Regardless of this finding, however, petitioners have not met the requirements of section 46(e)(3)(B) and, therefore, are not entitled to the credits. See Hokanson v. Commissioner,supra at 1250. For the foregoing reasons, we find that petitioners are not entitled to the investment credit with respect to the equipment discussed herein. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Sanders v. Commissioner,T.C. Memo. 1984-511, affd. by unpublished opinion 770 F.2d 174 (11th Cir. 1985); Peterson v. Commissioner,T.C. Memo. 1982-442↩. 3. We disagree with petitioner's contention that Highland Hills Swimming Club, Inc. v. Wiseman,272 F.2d 176 (10th Cir. 1959), and G.W. Van Keppel Co. v. Commissioner,295 F.2d 767 (8th Cir. 1961), are inapposite. Although these cases dealt with the period over which a lessee can depreciate or amortize the cost of improvements made on leased property, they required a determination as to whether the stated term of a lease should be disregarded, which is the precise factual issue presented here. See Peterson v. Commissioner,T.C. Memo. 1982-442↩.
4. Sanders v. Commissioner,supra.↩
5. See also Peterson v. Commissioner,T.C. Memo. 1982-442↩, n. 8. 6. At trial, McNamara candidly admitted that renewals of the subject leases were not negotiated by "independent parties facing each other," but that the parties tried to be "logical" and to make "intelligent business decisions," which were in the best interests of all concerned.↩