LAURENCE M. CARLSON AND PHYLLIS W. CARLSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 17491–79.    Filed August 9, 1982.

*Scott L. Simpson* and *Richard Kuhling,* for the petitioners.
*Jeannette A. Cyphers,* for the respondent.

IRWIN, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1971 | $209 | 1974 | $8,726 |
| 1972 | 1,965 | 1975 | 12,486 |
| 1973 | 2,534 | 1976 | 3,598 |

Following a concession by petitioners, the sole issue remaining for decision is whether petitioner Laurence M. Carlson[1] is entitled to the investment tax credit provided by section 38[2] for the years 1974, 1975, and 1976, for "apple-picking" bins that he purchased and leased to Welch Apples, Inc.

The years 1971, 1972, and 1973 are involved in this case only because of the elimination of investment credit carrybacks from 1974 through 1976. The correctness of these adjustments depends upon the resolution of the issue presented for decision.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the stipulated exhibits are incorporated herein by this reference.

Petitioner was a resident of Wenatchee, Wash., at the time

---

[1] Inasmuch as Phyllis W. Carlson is a party to this proceeding solely because she filed a joint return with her husband, for convenience we will hereinafter refer to Laurence M. Carlson as petitioner.

[2] All statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

the petition was filed in this case. He timely filed Federal income tax returns for the years in issue with the Internal Revenue Service Center, Ogden, Utah.

At all relevant times, petitioner, who was primarily engaged in the practice of law, was the attorney for Welch Apples, Inc. (hereinafter Welch Apples).[3] Throughout the years in issue, Welch Apples was engaged in the storage, grading, and packing of apples produced by independent growers. Usually, warehousers or processors of apples, such as Welch Apples, for a fee, supply the independent growers with apple-picking bins. As the growers harvest their apples, they deposit them in the apple-picking bins, which are plywood containers. The bins filled with apples are then immediately transferred to con- trolled atmosphere storage facilities maintained by the ware- houser, where they may be stored for 8 to 10 months. From June 1973 through 1976, petitioner leased apple-picking bins to Welch Apples.

Welch Apples had purchased all the apple-picking bins that it needed for each year prior to 1973, except for the year 1969, when it leased bins from H. R. Spinner Co. (hereinafter Spinner).[4] During the late 1960's and early 1970's, two major changes in the procedures for handling fruit in warehouses were occurring: (1) A switch was being made from regular atmosphere storage to controlled atmosphere storage, and (2) a change was being completed from using boxes to using apple- picking bins. Welch Apples had plans in 1973 to construct a controlled atmosphere storage facility, to be financed by Seattle First National Bank. Welch Apples was advised by both its certified public accountant and Wayne Lanphere, the

---

[3]During the years in issue, the stock of Welch Apples was held as follows:

| Name | Number of shares |
| --- | --- |
| Welch Orchards, Inc | 80 |
| Delicious Washington Apples, Inc | 71 |
| Longview Orchards | 15½ |
| J. W. Welch, Jr | 15½ |

Welch Orchards, Inc., and Perk Low each owned 50 percent of the stock of Delicious Washington Apples, Inc. J. W. Welch, Jr., who is petitioner's father-in-law, was the majority shareholder of Welch Orchards, Inc. John Robert Welch, who is the brother of J. W. Welch, Jr., was a partner in Longview Orchards.

[4]Spinner is a wholesale distributor for agricultural supplies and does not usually lease bins.

manager and vice president of Seattle First National Bank, that by leasing apple-picking bins, rather than purchasing them, it would enhance its balance sheet and thereby improve its credit standing.[5] In 1973, Welch Apples, consequently, decided to begin leasing apple-picking bins.

In the early spring of 1973, petitioner became aware that Welch Apples was in the process of determining whether to lease bins and, if so, from whom to lease them. Petitioner became interested in leasing the bins to Welch Apples. He discussed with J. W. Welch, Jr., and Reed Johnston (hereinafter Reed), who was employed by Welch Apples as general manager in charge of operations throughout the years in issue, the basic terms of a lease in 1973. Ultimately, Welch Apples decided to lease apple-picking bins from petitioner. Among the reasons for this decision was Reed's feeling that petitioner, as a member of the Welch family (see note 3), might be more lenient than another lessor, if Welch Apples failed to make a lease payment as a result of financial difficulties.

By a written lease agreement reflecting a date of June 11, 1973, petitioner agreed to lease 3,000 apple-picking bins to Welch Apples for a term of 7 years. Reed ordered those bins[6] in a partly assembled and treated condition from Spinner. Petitioner did not complete assembly of those bins.[7] Instead,

---

[5]Mr. Lanphere thought that, at that time, it was undesirable to show an obligation on financial statements for the purchase price of apple-picking bins, since there still was uncertainty as to the economic life of apple-picking bins and as to which size bin would eventually be considered to be a standard-sized bin by the apple industry.

[6]On brief, petitioner objected to any findings of fact that bins, rather than parts and materials, were ordered from Spinner. While admitting "the order form technically calls for a bin, as that is the simplest way of describing what is needed to fulfill the order," petitioner asserts, "there is no such thing as an apple-picking bin until petitioner's assembly process is completed." Any references herein to the partly assembled and treated bins as bins, rather than as parts and materials, is, like the description on Spinner's order forms, for the sake of simplicity.

[7]When apple-picking bins are ordered in a partly assembled condition, for each bin ordered, five major pieces are received: one bottom, two sides, and two ends. The sides already have metal corner brackets for support attached. The following items, which are required to assemble the bins, are included with the partially assembled bins: nails, bolts, nuts, washers, and glue. The only items that are required to complete assembly of the partly assembled bins which are not supplied with them are an electric drill, a glue applicator (paint roller), a hammer, a wrench, and a bucket.

The process of finishing assembly of the bins entails affixing the ends, the bottoms, and the sides to each other by using nails and glue. In addition, in the bottom of each box two holes, each of which is the correct size for a 3/4 flat-headed nut and bolt, must be drilled with an electric drill. Then, a bolt is driven with a hammer through each hole to a metal

Reed arranged for a worker named Walter Johnson, who had previously assembled bins to his satisfaction, to assemble the bins at a specific rate per bin. Mr. Johnson assembled the bins on his property in Chelan. Petitioner reimbursed Welch Apples after it had paid Mr. Johnson for completing 2,000 bins. He then paid Welch Apples for assembly of the other 1,000 bins.

By written agreements dated July 19, 1974, September 9, 1975, and July 8, 1976, petitioner leased 4,000 apple-picking bins, 5,000 apple-picking bins, and 4,000 apple-picking bins, respectively, to Welch Apples. Each lease provided for a lease term of 7 years.

Reed placed orders with Spinner for the bins to be leased from petitioner in 1974 and 1975. In those orders, he included all specifications for the bins and requested that the bins be shipped to Welch Apples. Spinner sent an "Acknowledgment" to Welch Apples for the order placed by Reed in 1975. An acknowledgment is mailed by Spinner to the customer who places an order, so that he may check the specifications. Spinner acknowledged to Welch Apples an order placed for the bins to be purchased by petitioner and leased to Welch Apples under the 1976 lease agreement.

After Spinner acknowledges an order for partly assembled bins, it then calls its supplier to arrange for the bins to be manufactured to meet the specifications of the customer. The partly assembled bins are then shipped directly from the supplier to the location requested by the customer. In 1974, 1975, and 1976, the bins in question, which were ordered in a partly assembled condition, were shipped to Welch Apples, where their assembly was completed.

Spinner generally invoices its customers for bins following their delivery. In 1974, Spinner invoiced petitioner for the bins ordered by Reed. In 1975, Spinner initially addressed some invoices for the bins ordered by Reed to Welch Apples. Such invoices, however, were changed and all the invoices in 1975

---

bracket. By the use of wrenches, the bolts are fastened with nuts through the bottom of the box and supporting brackets. The last step in the process of assembling a bin is placing glue, as a sealer, on the exposed plywood sides to protect them from rain, snow, irrigation water, and the like. A workman who is experienced at completing partly assembled bins can complete approximately between 30 bins and 50 bins in 1 hour.

were sent to petitioner. Spinner originally sent invoices in 1976 to Welch Apples for the bins ordered during that year. Later, Spinner issued new invoices to replace the invoices sent to Welch Apples and sent the new invoices to petitioner.

As in 1973, Reed arranged in 1974, 1975, and 1976 for various workmen, whom he knew were competent at completing assembly of bins, to assemble the bins to be leased from petitioner. Since the workmen already knew how to assemble the bins, they required no instruction. All the bins were assembled by them at Welch Apples' place of business. In each of the years 1974 and 1975, petitioner drew a check payable to Welch Apples for the cost of assembling the bins. In 1976, he drew a check jointly payable to Larry V. Zimmerman and Welch Apples for assembly of the bins leased to Welch Apples.[8]

In his notice of deficiency, respondent disallowed investment tax credits claimed on petitioners' income tax returns for the years 1974, 1975, and 1976 for the apple-picking bins.

## OPINION

Section 38 allows a credit against income tax for investment in "section 38 property." Section 48(a)(1) defines the term section 38 property to include generally depreciable, tangible personal property having a useful life of at least 3 years. Section 46(e)(3), however, provides, in pertinent part, as follows:

SEC. 46(e)(3). NONCORPORATE LESSORS.—A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if—

(A) the property subject to the lease has been manufactured or produced by the lessor, or

(B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, * * * [9]

---

[8] It is stipulated that petitioner paid all costs and expenses of assembling the bins in 1974, 1975, and 1976.

[9] The quoted section was originally designated as sec. 46(d)(3). Inasmuch as it was redesignated by Pub. L. 94–12, 89 Stat. 26, as sec. 46(e)(3), effective for taxable years ending after Dec. 31, 1974, we will hereinafter for convenience refer to it as sec. 46(e)(3).

Section 108 of the Revenue Act of 1971, Pub. L. 92–178, 85 Stat. 497, added section 46(e)(3) to the Code.[10] In connection with its enactment, the Senate commented as follows:

The committee is concerned, however, as was the House, that the restoration of the credit could once again make leasing arrangements motivated largely by tax reasons quite attractive. The committee agrees with the House that it is appropriate to impose limitations on the availability of the investment credit to individual lessors (and other noncorporate lessors).

The bill provides that the credit is to be available to an individual (or other noncorporate) lessor in only two situations. First, if the property which is the subject matter of the lease has been manufactured or produced by the lessor, the lessor is not to be denied the credit. The terms "manufacture" and "production" in this case include the construction or reconstruction of property. Thus, if two individuals are in the business of manufacturing a product and then lease instead of sell the product, they are not to be denied the credit with respect to the product assuming it otherwise qualifies as investment credit property. In these situations, the lease arrangement is an integral part of the taxpayer's business and is not likely to have been entered into for the purpose of reducing tax liabilities.

Second, the bill provides, in general, for the allowance of the credit in the case of short-term leases since in these cases the leasing activity constitutes a business activity of the taxpayer, rather than a mere investment, i.e., a financing arrangement. [S. Rept. 92–437, 92d Cong., 1st Sess. 43–44 (1971), 1972–1 C.B. 559, 583.]

Thus, it is clear that Congress intended, by the enactment of section 46(e)(3), to deny the investment credit to noncorporate lessors who have merely retained passive investment or financing risks, as opposed to having assumed the risks and obligations usually associated with an active business. *Ridder v. Commissioner*, 76 T.C. 867, 872 (1981).

Section 1.46–4(d)(1)(i), Income Tax Regs., consistent with the intent of section 46(e)(3)(A) as reflected in its legislative history, provides that a credit is allowed under section 38 to a noncorporate lessor of property if "such property has been manufactured or produced by the lessor in the ordinary course of his business."

Since petitioner is an individual, not a corporation, and he leased the apple-picking bins to Welch Apples by leases entered into after September 22, 1971, he must satisfy either section 46(e)(3)(A) or 46(e)(3)(B) to be entitled to an investment credit for the bins. Petitioner has conceded that section

---

[10]Sec. 46(e)(3) is applicable to leases entered into after Sept. 22, 1971.

46(e)(3)(B) is not applicable in his situation. He contends, however, that the apple-picking bins were manufactured by him in the ordinary course of his business of manufacturing and leasing such bins and that he is, therefore, entitled to the investment tax credit provided by section 38.

Respondent, on the other hand, maintains that petitioner has not satisfied the requirements of section 46(e)(3)(A) and the regulation thereunder. He advances three arguments in support of his position. First, respondent argues that the leasing activities of petitioner were not engaged in for profit and, therefore, do not constitute a trade or business. Second, he argues that the process of completing assembly of partly assembled bins, which are received with all hardware required to finish their assembly, does not amount to either manufacturing or production. Third, respondent argues that, even if assembly of the bins constitutes their manufacture, petitioner was not involved with the process of assembling the bins and, therefore, the bins were not assembled in the ordinary course of his business. On the basis of respondent's third argument, we hold that petitioner is not entitled to the investment credits claimed by him for apple-picking bins in 1974, 1975, and 1976.[11]

Neither the statute, nor its legislative history, nor the regulations indicate when property is considered to be manufactured by the lessor in the ordinary course of his business. However, giving the phrase "by the lessor" its natural and common meaning (*Welch v. Helvering*, 290 U.S. 111, 114 (1933)), petitioner would have to be either the one who actually manufactured the bins or the one who at least controlled the details of manufacture of the bins to satisfy section 46(e)(3)(A). See *Lykes Bros. Steamship Co. v. United States*, 206 Ct. Cl. 354, 513 F.2d 1342, 1348 (1975), and *Kansas City Southern Railway v. Commissioner*, 76 T.C. 1067, 1123 (1981) (which discuss when property is constructed by the taxpayer for purposes of section 48(b)(1)). Moreover, this interpretation of the phrase "by the lessor" is consistent with the general intent of section

---

[11]On their 1973 income tax return, petitioners claimed an investment credit for bins purchased in connection with the 1973 lease. In his brief, respondent states, however, that he did not disallow the credit claimed on petitioners' 1973 return, since the period for assessment of any tax due on that return had expired prior to his issuing the notice of deficiency.

46(e)(3)—to deny the investment credit to those taxpayers who have merely made a passive investment for the purposes of reducing their tax liabilities, rather than being actively engaged in a business. Thus, property is not transformed into property manufactured by the lessor simply because the lessor pays the costs and expenses associated with manufacturing it. Rather, as respondent asserts, the lessor must be "involved" with the manufacturing process.[12]

Petitioner does not claim that he personally rendered the services required to complete assembly of the bins. Moreover, we are not convinced that the workmen who finished assembly of the bins were petitioner's agents. To the contrary, the record indicates that such workmen received no instruction from petitioner, worked at his lessee's place of business, were hired by the lessee's general manager, and were paid by the lessee.

Petitioner, however, claims that he requested that Reed provide him with the names of workmen whom he trusted to satisfactorily complete assembly of the bins and then instructed Reed to contact those workmen. He further claims that the workmen, therefore, are independent contractors who were working for him.

Even if, arguendo, we view the workmen as independent contractors of petitioner, we must sustain respondent's determination. An independent contractor by definition is, of course, neither controlled by the person for whom he has contracted to do something nor subject to control with regard to his physical conduct in performing the undertaking by such

---

[12]Sec. 46(e)(3) was enacted as it was originally passed by the House except for language added by the Senate to clarify that the limitations imposed by it are not intended to apply to corporate partners of a lessor-partnership. In connection with the addition of such language, the following statement appears in the legislative history:

"(g) Lessee-Lessor.—The House bill provides that the investment tax credit is not to apply in the case of individuals who are lessors of property unless they are *manufacturers* or lease on short-term bases. The Committee clarifies the House bill * * * [117 Cong. Rec. 40162 (Nov. 9, 1971) (Announcement of Committee Decisions Reached in Executive Session, Senate Committee on Finance); 117 Cong. Rec. 40296 (Nov.10, 1971) (Statement of Representative Hatfield). Emphasis added.]"

We think that this portion of the legislative history bolsters the conclusion that sec. 46(e)(3)(A) was designed to allow the credit only to those lessors who are engaged in manufacturing or who exercise control over the details of the manufacturing process, as opposed to those who merely pay the costs and expenses associated with the manufacturing process.

person. *Hollingbery v. Dunn*, 68 Wash. 2d 75, 411 P.2d 431 (1966); 1 Restatement, Agency 2d., sec. 2 (1958). However, on the record before us, we are not required to hold that merely because a lessor hires an independent contractor he has not satisfied section 46(e)(3)(A), since petitioner, in any event, has failed to prove that he exercised the requisite degree of control over the details of assembly of the bins. Welch Apples ordered the partly assembled bins from Spinner,[13] providing Spinner with the necessary specifications for Spinner's supplier to manufacture them and advising Spinner to deliver them to its place of business. Assembling of the bins was then completed at Welch Apples' place of business. The workmen who assembled the bins were selected by Reed. Petitioner gave the workmen no instructions as to the manner in, or means by, which to complete assembly of the bins. There is no evidence indicating that petitioner was present to supervise the assembly of the bins or that he even inspected any bins to check whether they were properly assembled. In short, we find that petitioner merely financed the cost of assembling the bins, rather than engaged in the process of, or controlled the details of, assembling them.

Petitioner argues that his situation is distinguishable from the circumstances in which it is the goal of section 46(e)(3) to disallow the investment credit, namely, leasing arrangements entered into as a means of sheltering from tax income from other sources. In this connection, he claims that he entered into the lease agreements with Welch Apples for valid business reasons, not for the purpose of reducing his tax liability. Section 46(e)(3) unambiguously sets out certain alternative criteria that noncorporate lessors must satisfy to be entitled to the investment credit. It contains no indication that an exception will be made in the case of a taxpayer who fails to meet those criteria if he had valid business reasons for

---

[13]In concluding that petitioner was not involved with ordering the partly assembled bins, we have not overlooked letters addressed to Spinner by petitioner to confirm that orders had been placed for the bins and that he would be billed for the bins. The letters simply do not indicate that the orders had been placed by petitioner. In light of the fact that the only sales order forms for 1974 and 1975 that could be procured from Spinner indicate that Reed placed the orders in those years, we find petitioner's testimony that he placed them unconvincing. Had petitioner actually placed the bin order in 1976 (a year for which no sale orders could be found according to respondent), we doubt that Spinner would have acknowledged the order to Welch Apples and initially invoiced Welch Apples.

entering into a leasing transaction. Under these circumstances, the presence or absence of valid business reasons of petitioner for entering into the leasing transaction in question is wholly irrelevant. See, e.g., *Warrensburg Board & Paper Corp. v. Commissioner*, 77 T.C. 1107 (1981); *Tufts v. Commissioner*, 70 T.C. 756, 769 (1978), revd. 651 F.2d 1058 (5th Cir. 1981) (legislative history may not be used in derogation of an unambiguous statutory expression).

Finally, in their petition, petitioners pray for an award of "reasonable attorney's fees and costs." This Court has previously held that it does not have jurisdiction to award either attorney's fees (*McQuiston v. Commissioner*, 78 T.C. 807 (1982); *Key Buick Co. v. Commissioner*, 68 T.C. 178 (1977), affd. 613 F.2d 1306 (5th Cir. 1980)), or costs (*Sharon v. Commissioner*, 66 T.C. 515, 533–534 (1976), affd. 591 F.2d 1273 (9th Cir. 1978)), to a petitioner.

*Decision will be entered for the respondent.*