LEN O. HANNAMAN AND WILDEANA HANNAMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hannaman v. Commissioner
Docket No. 7678-88
United States Tax Court
T.C. Memo 1991-96; 1991 Tax Ct. Memo LEXIS 115; 61 T.C.M. (CCH) 2067; T.C.M. (RIA) 91096; March 5, 1991, Filed *115 Decision will be entered under Rule 155. Janet L. Bolvin, for the petitioners. Robert P. Crowther, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioners' joint Federal income taxes as follows: Additions to Tax
Year
Deficiency
[1] Section 6653(a) Section 6653(a)(1)
Section 6653(a)(2)
1979
$ 5,720.00 $ 286.00
--
--
1981
$ 3,726.00 --
$ 186.00
* 1982
$ 10,534.00
--
$ 529.95
* After concessions by respondent, [2] the issues remaining for decision are: (1) Whether a component structure described more particularly herein is "section 38 property" as defined in section 48(a)(1); (2) whether the component structure avoids the section 46(a)(3) *116 disqualification of lodging facilities as section 38 property; and (3) whether petitioners avoid the section 46(e)(3) noncorporate lessor limitation by having "manufactured or produced" the property for which they claim investment tax credit. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioners [3] resided in Anchorage, Alaska, at the time they filed their petition in this case. *117 Petitioner began working in construction as an apprentice electrician at the age of 14. Since then he has been a marketing representative and group manager of marketing representatives for manufacturers of modular structures. In 1975 petitioner organized his own construction company named L & H Enterprises, Inc. (LHEI). LHEI specializes in construction of pre-engineered buildings, but also performs general construction work. During the relevant period, LHEI employed carpenters, engineering consultants, a draftsman/designer, a mechanical contractor, and an electrical contractor. Petitioner is president and chief executive officer of LHEI. His duties include selling construction projects, managing the office paperwork and office staff, and managing the design and construction of projects. He averages building one build-leaseback property every two to three years. One of petitioner's build-leaseback projects was an office building leased to Geophysical Service, Inc. (GSI). By late 1981, GSI was planning a support camp facility to be used in connection with its seismic exploration of the Prudhoe Bay off Alaska's northern coast. On March 30, 1982, the State of Alaska, as lessor, *118 and GSI, as lessee, entered into a lease for a parcel of land at the airport in Deadhorse, Alaska, to be used for their support camp facility (Alaska Lease). The Alaska Lease had a 35-year term beginning May 7, 1982, and authorized the following uses: Construction, maintenance, and operation of office and shop buildings for use in conjunction with [GSI's] seismic exploration services; storage of seismic camp units and equipment; maintenance of seismic camp units and equipment; storage of heating and vehicle fuel; and food and lodging for [GSI's] employees and sublessee's employees only.
The Alaska Lease also contained the following special covenant: 9. Use of the Premises for any of the following purposes is hereby specifically prohibited: Commercial hotel providing lodging services to the general public, restaurant or other facility providing meal services to the general public, liquor store, bar, and cocktail lounge.
GSI's facilities manager, Rob Mood, consulted petitioner during the period the performance specifications for the proposed camp were prepared. The performance specifications developed at GSI's request for the facility were compiled in a 50-plus-page *119 document entitled "Technical Specifications for Pad Installation and Camp and Service Building Design and Construction" (Specifications Document). GSI solicited competitive bids for construction of the support camp based upon the Specifications Document which described the scope of work to be performed as follows: This contract shall include the design, fabrication, and installation of the camp, service building, and a gravel pad at the Prudhoe Bay site. This contract shall include all labor, transportation, and materials required to provide an operating camp, service building as described herein, and gravel pad as shown on the drawings.
The Specifications Document contains drawings of the site plan, front and rear elevation views of the shop building, and floor plans for the shop building. The site plan, dated March 1982, shows the area of the leased parcel that is to be covered by a gravel pad, and locations on the gravel pad for the service building and camp. The Specifications Document does not contain a floor plan for the camp unit, but places a rectangular camp unit approximately 50 feet from the service building. The Specifications Document also provides as follows: *120 1.3.1 Calculations
(a) Subcontractor shall collect and develop the following data and shall use these data as the basis for sizing the system components, checking system performance, and setting system protective relays and devices: (1) load list (2) Short Circuit data
2.3.13 Generators
The Contractor shall furnish two identical diesel generator sets of equal KW capacity output, each sized to handle the complex load, plus a minimum of 25% extra capacity above this load. Additionally, the generator radiator shall be ducted to the service building warehouse, and a small blower attached to capture waste heat. * * *
2.3.15 Support for Equipment
Contractor shall provide all necessary supports for equipment installed under this specification section. * * *
Petitioner submitted a bid in the name of Len O. Hannaman & Associates (LOHA). He used the "& Associates" designation to provide for the eventuality of bringing in partners if he could not obtain sufficient capital to finance the project himself. LOHA has always been petitioner's sole proprietorship and has never had partners or associates. GSI assigned the Alaska Lease to LOHA on July 8, *121 1982. The lease assignment agreement required LOHA to assume all rights and obligations of GSI under the Alaska Lease, and to comply with all terms and conditions contained therein. LOHA, as lessor, simultaneously subleased the parcel back to GSI, as lessee, on July 8, 1982. The sublease contained the following recitals: B. Alaska Industrial Development Corporation ("AIDA") has adopted a resolution whereby it will issue 10-year industrial development bonds (the "Bonds") for the purpose of having certain improvements constructed by the Lessor, [LOHA] to the specifications of the Lessee, [GSI] on the land covered by the Ground Lease. The Bonds shall be paid from the rental of such improvements. C. Lessor [LOHA] and Lessee [GSI] now desire to arrange for the construction of the improvements and the terms of the agreement for subleasing of the real property covered by the Ground Lease, [Alaska Lease] together with the improvements.
The sublease was for an initial 10-year period with two successive 5-year renewal options, and contained the following covenants: Construction and Use of Premises
It is understood and agreed that Lessor [LOHA] will construct on the *122 land the Improvements for the use of the Lessee, [GSI] described as follows: 10 acre gravel fill pad 5 feet deep, 6250 gross square foot shop/warehouse building, and a camp building of approximately 4600 square feet to accommodate 33-person living quarters.
The improvements shall be constructed in accordance with the Plans and Specifications. The Plans and Specifications have been examined and approved by Lessee. If Lessor finds it is necessary or appropriate to make any changes in the Plans and Specifications at any time prior to or during construction, Lessor must first obtain Lessee's written consent, which consent shall not be unreasonably withheld. Lessor shall complete construction of the Improvements by , 1983. The Lessor shall be responsible for methods of construction, installation of materials and equipment, and warrants that the Improvements will be constructed in compliance with the applicable laws, ordinances, rules, and regulations of the governing body(ies) having jurisdiction over such construction: and any damages resulting from a breach of this warranty will be the sole responsibility of the Lessor, subject to the limitation on claims by the Lessee * *123 * * 29. Acceptance of Improvements
Upon written notice from Lessor that the Improvements are completed, Lessee agrees to make an immediate inspection of the Improvements and to acknowledge acceptance thereof as completed in accordance with the Plans and Specifications, or to give the Lessor written notice of such items the Lessee deems to be incomplete, such items hereinafter referred to as "Punch List Items." If the Punch List Items do not prevent the Lessee from using the Premises for the intended use, then rent payments shall commence from the date of Lessor's notice of completion and the Lessor shall proceed forthwith to complete the Punch List Items. If the Punch List Items are such that the Lessee may not use the Premises for the intended purpose until completion of such items, the rent payments for the Improvements shall not commence until the Punch List Items are completed, or the Bonds are issued, whichever occurs first. The expiration date shall not be extended for the time used in completing the Punch list Items.
On July 12, 1982, LOHA formally entered into a contract with LHEI for the construction of the GSI facility. That contract provides as follows: *124 The Contractor shall perform all the Work required by the Contract documents, including materials, labor, equipment, supervision, and related management services as described herein: Design and construct a 10 acre gravel pad, 6,250 square foot shop building, and a 33 man modular camp, in accordance with contract drawings and specifications. Contract price includes all design costs, permitting, freight, travel expense, room and board cost, equipment, material, labor and management services, as required for a complete turnkey construction of the above facility.
The service building LHEI constructed for the facility is a pre-engineered steel building. Adjacent to the service building is an electrical power generation module. The power generation module provides the electrical power supply to the whole 20-acre site and consists of two 250 kilowatt generator sets (gensets) placed on a metal skid covered by a protective shed. The shed is an integral part of the generator module that protects the gensets and associated controls from the harsh environment of Alaska's north slope. The shed protecting the gensets is constructed of a wood frame with a sheet metal exterior matching *125 the service building. The shed is connected to the service building solely by 26-gauge flashing to prevent snow from falling in between the generator module and the service building. The shed has two doors that provide access to allow maintenance personnel to service the gensets and room for nothing other than the gensets and service space. There is also an air duct running from the generator module to the shop that allows the waste heat from the generators to flow into the service building. LHEI procured the gensets and metal skid from Waukesha Alaska Corporation. The gensets are assembled from a Kato generator and a Deutz diesel engine and are anchored to the skid. [4] The metal skid is placed on timbers to level the gensets and prevent them from sinking into the gravel. The power generation module is a mobile unit and may be transported by merely placing the skid on a trailer or long flat-bed truck. *126 On June 4, 1982, Evergreen Mobile Co. (Evergreen), as a subcontractor, submitted a bid to LHEI, as general contractor, for construction of the 33-man camp facility which, after modifications, was ultimately accepted. The camp facility is a two-story structure constructed from eight subunits each resembling a mobile home from the exterior. The subunits were manufactured in Washington State and hauled on dollies to the Seattle, Washington, docks. From Seattle, they were shipped by barge to Anchorage, Alaska, then transported by truck over the Haul Road to the Deadhorse Airport site for final assembly. Upon arrival at the construction site, the four ground-floor units were anchored to steel pilings, leveled, and squared. Two of the ground floor subunits were laid end-to-end, and the other two ground floor subunits, also laid end-to-end, were placed in juxtaposition to the other two leaving a gap between them. A corridor consisting of 4- by 8- foot sections was placed in the gap on steel angled shelves forming the hallway for the completed floor. In an identical fashion, the four top floor subunits were stacked on the first floor units and additional 4- by 8-foot sections were *127 placed in the gap for the top floor hallway. Final on-site assembly of the camp building included connecting the electrical supply, connecting the plumbing supply and disposal, hanging doors, assembling permanent furniture, and building the exterior stair wells. The following table represents petitioner's cost in constructing the support camp. Site preparation (10 acre gravel pad)
and shop and warehouse building     $ 1,963,607
Modular structure:
Purchase price of modular units   $ 261,360
Freight   50,324
Subcontract   33,205
Labor and materials   27,311
Overhead allocation   44,664
416,864
Generator and surrounding structure:
Purchase of generator and base plate   $ 106,469
Freight   11,101
Labor   10,000
Overhead allocation   16,152
Miscellaneous materials   7,030
150,752
Petitioner assisted in selecting the work crews used to perform the construction labor. Because of financing concerns, he also supervised construction costs and was involved in the negotiations and purchasing decisions for the modular units and generator equipment. The on-site day-to-day construction was supervised by Aaron Jones, the project supervisor employed by LHEI. *128 Petitioner visited the construction site approximately five or six times during the construction period. One of those visits was the final inspection for completing the "punch list." However, petitioner was in daily contact with Mr. Jones. By November 1982 GSI had moved in and was using the facility. More than 50 percent of the 33-man camp structure was used as living accommodations for GSI employees, none of whom stayed more than 30 days at any one time. In addition to GSI employees, two caretakers provided under contract by Arctic Hosts, Inc., stayed at the camp. Petitioner claimed investment tax credit in 1982 based on the cost of the modular structure and the generator with its surrounding structure. He did not claim investment credit for the shop and warehouse building or the gravel pad. Respondent disallowed the investment credit because the 33-man camp structure is a building and not section 38 property; because the 33-man camp structure does not fall within the section 48(a)(3) lodging exception; and because petitioner is a noncorporate lessor within the meaning of section 46(a)(3). OPINION During the relevant period, [5]sections 38 and 46 allowed, inter alia, a *129 tax credit for the investment in qualifying property (i.e., "section 38 property") as defined in section 48. Petitioner bears the burden of proving he is entitled to the credit. Rule 142(a). He contends that the 33-man modular structure is section 38 property as described in section 48(a)(1) and not a "building" under decided case law; and, he falls within the section 48(a)(3) exception for property used for lodging. Section 48(a) provides, in relevant part to our discussion, [6] as follows: SEC. 48 DEFINITIONS; SPECIAL RULES (a) Section 38 property. -- (1) In general. -- Except as provided in this subsection, the term "section 38 property" means -- (A) tangible personal property (other than an air conditioning or heating unit)
* * * (3) Property used for lodging. -- Property which is used *130 predominantly to furnish lodging or in connection with the furnishing of lodging shall not be treated as section 38 property. The preceding sentence shall not apply to -- (B) property used by a hotel or motel in connection with the trade or business of furnishing lodging where the predominant portion of the accommodations is used by transients.
A cursory reading demonstrates that section 48(a)(1)(A) generally describes section 38 property and section 48(a)(3) provides a specific exclusion of property predominantly used for lodging from the section 38 property description. However, section 48(a)(3) also excepts certain property from that exclusion. A time-honored principle in statutory construction is that specific provisions of a statute prevail over its general *131 provisions. See Bulova Watch Co. v. United States, 365 U.S. 753, 758, 6 L. Ed. 2d 72, 81 S. Ct. 864 (1961); Ginsberg & Sons v. Popkin, 285 U.S. 204, 208, 76 L. Ed. 704, 52 S. Ct. 322 (1932). There can be no serious dispute that the 33-man camp structure was used predominantly to furnish lodging for GSI employees. Therefore, unless the exception applies, we need not decide whether the modular structure is section 38 property as generally described in section 48(a)(1)(A). Section 48(a)(3)(B) excepts property used by a hotel or motel in connection with the trade or business of furnishing lodging where the predominant portion of the accommodations is used by transients. Petitioner was not in the trade or business of providing lodging and was expressly prohibited by the lease from operating a hotel. Thus, petitioner does not fall within the lodging exception. The 33-man camp structure is not section 38 property and does not qualify for investment tax credit. Respondent concedes the generator module is section 38 property; however, he disallowed petitioner's claimed investment tax credit because petitioner is a noncorporate lessor. Petitioner contends that he "manufactured or produced" the generator *132 module and, therefore, falls within the section 46(e)(3)(A) exception. [7]
Section 46(e)(3)(A) provides, in relevant part, as follows: (3) Noncorporate Lessors. -- A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which the person is the lessor only if -- (A) the property subject to the lease has been manufactured or produced by the lessor * * *
The focus of the "property subject to the lease" language is the leased property for which the investment tax credit is sought. Egizii v. Commissioner, 86 T.C. 450, 455 (1986). The lessor would have to be the one who actually manufactured the property or the one who at least controlled the details of manufacture of the property to satisfy section 46(e)(3)(A). Carlson v. Commissioner, 79 T.C. 215, 222 (1982), *133 affd. 712 F.2d 1314 (9th Cir. 1983) The terms "manufactured or produced" include "constructed". S. Rept. No. 92-437 (1971), 1972-1 C.B. 559, 583. The accompanying regulation adds the requirement that the subject property must be manufactured or produced in the ordinary course of the lessor's business. Sec. 1.46-4(d)(1)(i), Income Tax Regs. With the foregoing principles in mind, the question we must answer is whether petitioner exercised sufficient control over the generator module construction details [8] in the ordinary course of his business to satisfy section 46(e)(3)(A). We first construed section 46(e)(3)(A) in Carlson v. Commissioner, supra. The lessor-taxpayer in Carlson leased apple bins physically assembled by the lessee's employees. He failed to convince the Court that he controlled the details of assembly or that his involvement in the assembly was anything *134 more than reimbursing the lessee for the expenses of completing assembly of the apple bins. We stated that "property is not transformed into property manufactured by the lessor simply because the lessor pays the costs and expenses associated with manufacturing it." 79 T.C. at 223. We next interpreted section 46(e)(3)(A) in Egizii v. Commissioner, supra, a case factually closer to the instant case, but also distinguishable. Therein, the taxpayers contracted with an unrelated construction corporation to build a warehouse the taxpayers leased to their wholly owned corporation. Even though the taxpayers held weekly consultations with their architect and made weekly inspection visits to the construction site, their involvement in the construction overall was limited to discerning the propriety of progress payments. The contractor therein was responsible for the construction details under the terms of the construction contract. Egizii v. Commissioner, 86 T.C. at 457. We dismissed the taxpayers' role in the overall construction and held that entitlement to the investment tax credit depended upon the lessor's manufacture of the *135 section 38 property subject to the lease, not the entire property subject to the lease. In both Carlson and Egizii, we considered factors such as the provision of the specifications for the property and the selection, supervision, and instruction of the workers to be the significant factors in deciding whether the taxpayer exercised sufficient control over construction details. Neither of these factors is necessarily controlling, and they collectively amount to the exercise of control over the construction details. The clear import of our decisions in both cases is that taxpayers must do more than merely finance the project; they must be actively involved in the construction to be considered the "manufacturer or producer" of the section 38 property. Those cases do not, however, specify the minimum level of involvement sufficient to satisfy the statute and we do not intend to do so here. The most obvious distinguishing features of this case and Egizii are (1) petitioner's wholly owned construction corporation actually constructed the property for which the investment tax credit is sought, i.e., the generator module; and, (2) petitioner individually was responsible *136 for the construction methods and installation of materials and equipment. Petitioner may not rely on his status as president and chief executive officer of LHEI to fulfill the construction requirement of the statute. Such status is not equivalent to involvement. [9] We must examine petitioner's actual involvement, as proprietor of LOHA, in building the generator module with the caveat that some of the functions petitioner performed in his corporate capacity in the overall project necessarily affect the generator module. *137 Petitioner was consulted during the period GSI was compiling the Specifications Document. The extent to which petitioner's suggestions, if any, were eventually incorporated into the Specifications Document is not clear from the record. [10] However, the Specification Document does not contain blue-prints for the facility or specify the size or manufacturer of the generators to be used. Further, the Specifications Document clearly states that the design for the entire facility, other than the site plan and warehouse building, is the contractor's responsibility. The generator module actually built differs from the configuration of the "generator building" shown on the warehouse floor plan in the Specifications Document. Those specifications *138 require that the contractor provide support for the equipment, but do not specifically require the gensets to be placed on metal skids. The concrete flooring of the warehouse building could easily have been extended to provide support for the gensets. [11] The least that may accurately be stated is that provision of the detailed project specifications was a cooperative effort between GSI and petitioner. *139 The portions of the Specifications Document regarding the generator requirements served as the basis for soliciting bids from suppliers of electrical generators. The Specifications Document requires installation of two equal kilowatt electrical generators sized to handle the complex load, plus an extra 25-percent capacity. Petitioner's subcontractor was required by the Specifications Document to calculate the complex load and determine the required generator size. Petitioner did not have the resources or equipment to manufacture gensets which, in any event, were purchased. The gensets, however, are only two of the components comprising the generator module. The sublease agreement petitioner entered into after having been awarded the project required him to construct the agreed-upon improvements and placed the responsibility for "methods of construction, installation of materials and equipment" upon him. Petitioner assisted in selecting the construction workers, chose the supplier of the gensets, and was responsible for the generator module installation and testing. The construction workers were supervised by a project supervisor employed by LHEI who was in daily contact with *140 petitioner. Petitioner's role in the construction process may summarily be described as that of the prime contractor. The significant factors critically absent in Carlson and Egizii (i.e., provision of specifications, and selection, supervision, and instruction of workers) are at least tangentially present in this case. Based on the entire record we conclude that petitioner constructed the generator module in the ordinary course of his business and is entitled to the investment tax credit for the generator module. Respondent argues that petitioner must respect LHEI as a corporate entity and may not disregard its existence in determining whether he individually was the manufacturer. See Bollinger v. Commissioner, 485 U.S. 340, 99 L. Ed. 2d 357, 108 S. Ct. 1173 (1988); National Carbide Corp. v. Commissioner, 336 U.S. 422, 93 L. Ed. 779, 69 S. Ct. 726 (1949); Moline Properties v. Commissioner, 319 U.S. 436, 87 L. Ed. 1499, 63 S. Ct. 1132 (1943). Petitioner cites the same authority and argues essentially that LHEI was petitioner's agent for construction. A corporation is a separate taxable entity; however, it is also an artificial creature created under statute that may only act through its officers, agents, *141 and employees. A fair inference is that petitioner submitted his bid contemplating that his corporate employees would perform the physical construction labor under his direction as proprietor of LOHA. Thus, whether or not the corporation was petitioner's agent, petitioner individually controlled the generator module construction details sufficiently to satisfy section 46(e)(3)(A). We have considered the parties' alternative arguments on all issues presented, and conclude they are unpersuasive. To reflect respondent's concessions and the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest payable on the deficiency.↩
2. Respondent concedes the additions to tax under section 6653(a), and that petitioners incurred a net operating loss in 1985 that may be carried back to 1982.↩
3. Inasmuch as Wildeana Hannaman is a party to this proceeding solely because she filed joint returns with her husband, for convenience we will hereinafter refer to Len O. Hannaman as petitioner.↩
4. Petitioner purchased the skid upon which the gensets rested from the manufacturer of the gensets because they quoted the lowest price. The gensets were attached to the skid by Waukesha prior to shipment.↩
5. The investment tax credit was repealed by sec. 211(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2166, effective, subject to transition rules, for property placed in service after December 31, 1985.↩
6. We assume petitioner is arguing the modular structure meets the general section 48(a)(1)(A) requirements. Section 48(a)(1)(B) includes "other tangible property" only if it is used by the taxpayer in enumerated activities which do not apply here.↩
7. Petitioner has stipulated that the lease term with extensions exceeds one-half of the useful life of the leased property and does not assert that the tests set forth in sec. 46(e)(3)(B)↩ are satisfied.
8. Petitioner does not contend that he labored in physically building the generator module.↩
9. Miyamoto v. Commissioner, T.C. Memo 1986-313, involved a case strikingly similar to Egizii v. Commissioner, 86 T.C. 450↩ (1986). Therein, partnerships were formed to lease restaurants and restaurant equipment associated with a national fast-food chain. One of the partners owned, and was president of, a construction corporation that contracted for construction involving two of the restaurants. The extent of any construction work performed by that partner was not attributed to the partnerships. To the extent manufacture of the restaurant components may have been accomplished by construction, the partnerships failed to prove they exercised control over the construction details in the ordinary course of their business.
10. Petitioner argues that the specifications initially called for a T-shaped drilling complex for the camp portion of the facility and he changed the shape of the camp to a rectangular structure. The Specifications Document site plan dated March 1982 indicates to the contrary.↩
11. The Specifications Document provides for placement of a concrete pad for the service building "in accordance with the attached specification 'Concrete Placement'." The "Concrete Placement" specification is not included with the Specifications Document which was the parties' joint exhibit. It is not significant that "Concrete Placement" specifications are not included in the Specifications Document because if the specifications document required the generators to be anchored to the concrete slab, they were not. If the gensets were not required to be anchored to the concrete slab, they could have been. Either scenario demonstrates petitioner's flexibility in building the module.↩