GLENN H. SUTOW AND JANICE S. SUTOW, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Sutow v. Commissioner
Docket Nos. 20102-88, 20103-88, 20104-88
United States Tax Court
T.C. Memo 1992-473; 1992 Tax Ct. Memo LEXIS 495; 64 T.C.M. (CCH) 537; August 19, 1992, Filed *495 Decisions will be entered for respondent. For Petitioners: Osami Maruyama. For Respondent: Steven M. Roth. GOFFE
GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in the Federal income taxes of petitioners as follows: Petitioner(s)
Year
Deficiency
Glenn H. and Janice S.
1980
$ 5,399
Sutow
1983
8,106
Alan A. Patel
1983
2,841
Paul F. Gill
1980
5,855
1983
7,854
The issues for decision are: (1) Whether GSP Investments, a partnership in which three of petitioners were partners, satisfied the noncorporate lessor requirements of section 46(e)(3)(B), [2] so as to qualify for an investment tax credit on certain equipment purchased in 1983; and (2) whether the depreciation deduction allowable to the partnership for 1983 must be computed, under section 168(f)(5), based upon a 1-month short taxable year. *496 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated by this reference. At the time their respective petitions were filed, Glenn H. and Janice S. Sutow resided in San Dimas, California, Alan A. Patel resided in Glendale, California, and Paul F. Gill resided in Arcadia, California. References hereinafter to "Sutow" are to Glenn H. Sutow. Sometime in 1983, Gill, Sutow, and Patel decided to join together in a partnership called GSP Investments (GSP). In May, they opened a money market account in the name of GSP by depositing $ 40,000 at Home Savings of America. By June 20, 1983, interest of $ 302.47 had been credited to this account. They also applied to the IRS in May for an employer identification number. They received notification of their assigned number, in the name of GSP, in August of 1983. The profit and loss sharing percentages in GSP, and capital contributions, were 45 percent for both Gill and Sutow and 10 percent for Patel. 1040 Computer Services, Inc. (Computer Services), had been incorporated in 1980. At least through 1987, Sutow, Gill, and Patel were shareholders who together *497 held 83 percent of the stock. Sutow was the president and a director throughout this period. Gill was also an officer and a director. Computer Services assisted accountants in the preparation of income tax returns. The accountants first filled out and returned input forms provided by Computer Services. After keypunching, the raw data was entered into an on-site mainframe computer, almost all of the programming for which was developed and maintained by a separate corporation called Tax of Louisiana. The mainframe computer performed calculations and otherwise manipulated the data, ultimately producing a magnetic output tape. Computer Services then combined the output tape with printing equipment to print completed income tax returns, which were sent back to the accountants. On October 4, 1983, GSP agreed to purchase from Xerox Corp. (Xerox) a Model 8700/58 laser printer and an off-line tape control module (together sometimes referred to as the 8700) for a combined cost of $ 241,750 before freight, taxes, and trade-in allowances. [3] By the terms of the purchase agreement, the equipment was to be installed at Computer Services beginning on December 6, 1983. Xerox provided an *498 express 90-day warranty, during which time it supplied free parts and service. On the same day that GSP and Xerox entered into the purchase agreement, they also entered into a Full Service Maintenance Agreement (FSMA) to begin on March 12, 1984, when the 90-day warranty was due to expire. The agreed cost of the maintenance service to GSP was $ 1,965 per month in 1984 and 1985, plus a per-page "click charge" of $ .0038 (during early 1984) or $ .0032 (thereafter). [4] Under the FSMA, service was available 24 hours a day on weekdays, but GSP also contracted for Extended Service Coverage (ESC), which expanded the 24-hour service to weekends. Incorporated *499 by reference in the purchase agreement and the FSMA was a letter from Gill to Xerox, which stated in part: Xerox Printing Systems will allow the option of implementing an FSMA for each system in full calendar month increments, but in total not less than three months within each FSMA calendar year term. This FSM flexability [sic] is offered to accomodate [sic] workload that is expected to vary substantially from month to month throughout the calendar year. 1040 will give thirty (30) days advanced written notice for commencement and termination of FSM coverage. By written lease dated December 15, 1983, GSP leased the 8700 to Computer Services for a 3-year term "with 1 year renewal options", which the parties understood to mean two 1-year options. The monthly cost for 1984, which was to be updated each January, was set at $ 3,930. The express monthly "off-season credit" was $ 1,965, the unstated rationale being that preventative maintenance would be unnecessary for idled equipment. The lease entitled Computer Services to implement and suspend the FSMA (and ESC) coverage in accordance with the GSP/Xerox purchase agreement, and the monthly lease payment would be adjusted by "the *500 corresponding amount" saved by or charged to GSP. Although not mentioned in the lease, Computer Services was also obligated to pay GSP 1.12 cents per printed page as a click charge. Computer Services paid GSP the following amounts for the specified months in 1983 and 1984: TABLE 1 Month
Base Amount
Click Charge
Total
Dec. 1983
$ 3,930
$ 1,077
$ 5,007
Jan. 1984
3,930
[1]--
3,930
Feb. 1984
3,930
4,001
7,931
Mar. 1984
3,930
5,204
9,134
Apr. 1984
3,930
3,752
7,682
May 1984
3,930
327
4,257
June 1984
1,965
0
1,965
July 1984
1,965
0
1,965
Aug. 1984
1,965
0
1,965
Sep. 1984
1,965
0
1,965
Oct. 1984
1,965
0
1,965
Nov. 1984
3,930
742
4,672
In the typical tax-season months of November through the following May, including December 1983 through May 1984, FSMA coverage was operative and no off-season credits applied. In June through October 1984, the $ 1,965 reduction from the normal monthly base amount of $ 3,930 was a direct result of suspended maintenance *501 coverage, which saved GSP $ 1,965 per month in payments to Xerox. Because no pages were printed during these 5 months, Computer Services paid no click charge to GSP, and GSP paid no click charge to Xerox. From December 1983 through mid-March 1984, Computer Services incurred a monthly lease obligation and click charges to GSP even though GSP, with the 90-day Xerox warranty in effect, made no payments to Xerox. Xerox billed and GSP paid the following amounts for the specified periods: TABLE 2 Period
FSMA Base Amount
Click Charge
Total
Mar. 13-31, 1984
$ 1,245
$ 443
$ 1,688
Apr. 1984
1,965
[1]-- 1,965
Nov. 1984
1,965
212
2,177
Dec. 1984
1,965
480
2,445
$ 8,275
On the invoice dated May 29, 1984, which covered March and April, Xerox also billed $ 950 as a one-time ESC charge. The 8700 produced rental income of $ 47,314 to GSP during the first 12 months of the lease with Computer Services. For this same period, the 8700 generated deductions allowable *502 to GSP under section 162 in the amount of $ 7,963. The $ 7,963 amount is derived from the table 2 total of $ 8,275, with two adjustments. First, the December 1984 amount is prorated only through December 15 because the first 12 months of the lease expired on that date; this results in a negative adjustment of $ 1,262. Second, the one-time ESC charge entails a positive adjustment of $ 950. There was no physical connection between the mainframe computer and the 8700 at Computer Services. The magnetic tape generated by the mainframe computer was loaded onto a tape drive on the control unit of the 8700. That control unit, in addition to a tape drive, had a built-in computer called a processor, a hard disk drive, a keyboard, and a monitor. The tax return forms used by Computer Services were stored on a disk in the control unit. A control program would read in the magnetic tape data, format it, and print it using a process called xerography. The imaging unit of the 8700, which was separate from the control unit, was where the laser printing actually took place. Without the magnetic tape input, the processor in the control unit could perform some functions through keyboard input, *503 such as simple word processing to create letterheads, brochures, or pamphlets. The monitor, however, which displayed commands and input, would not show the created document in its printable form. The 8700 had no numerical calculation capability. Without the processor in the control unit, the 8700 was useless. On its U.S. Partnership Return of Income (Form 1065) for calendar year 1983, GSP recorded its "Date business started" as October 13. Reported income was $ 196 of bank interest, and claimed deductions consisted of $ 203 of bank expenses and $ 30,440 of depreciation, for a net loss of $ 30,447. In determining deficiencies for 1983, the Commissioner made partnership-level adjustments to GSP that flowed through to partners Gill, Sutow, and Patel. Specifically disallowed was each partner's distributive share of an investment tax credit for the 8700, on the ground that GSP did not satisfy the noncorporate lessor requirements of section 46(e)(3). In addition, each partner's distributive share of ordinary loss from GSP was substantially reduced because the Commissioner concluded that GSP should have calculated its depreciation based upon a 1-month short taxable year. For Gill *504 and the Sutows, the Commissioner also disallowed claimed excess investment tax credits attributable to the 8700, which were carried back from 1983 to 1980. OPINION The first issue for decision is whether GSP is eligible for an investment tax credit on its purchase of the 8700 in 1983. Section 38 allows a credit against income tax for tangible personal property that is recovery property within the meaning of section 168. Sec. 48(a). Section 46(e)(3)(B) limits the availability of the credit, for noncorporate lessors who have not manufactured or produced the property, to those situations in which-- the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property. In enacting section 46(e)(3), Congress intended to deny the credit to noncorporate lessors *505 who merely retained passive investment risks rather than assuming the risks and obligations usually associated with an active business. Carlson v. Commissioner, 79 T.C. 215, 221 (1982), affd. 712 F.2d 1314 (9th Cir. 1983); H. Rept. 92-533, at 29 (1971), 1972-1 C.B. 498, 513; S. Rept. 92-437, at 44 (1971), 1972-1 C.B. 559, 583. Respondent contends that GSP fails both the 50-percent test and the 15-percent test in section 46(e)(3)(B). For purposes of the 50-percent test, the parties agree that the term of the lease between GSP and Computer Services was 5 years. Although they also agree that Rev. Proc. 83-35, 1983-1 C.B. 745, is the authoritative reference for the useful life of the 8700, they disagree about the applicable classification category. Petitioners maintain that the 8700 falls within asset guideline class 27.0, entitled "Printing, Publishing, and Allied Industries", with a corresponding life of 11 years. Id. at 751. Respondent argues that the 8700 falls within asset guideline class 00.12, entitled "Information Systems", with a corresponding life of 6 years. Id. at *506 746. Although the parties devoted much attention to this issue at trial and on brief, we need not resolve it. We agree with respondent that GSP fails the 15-percent test, and that failure alone is enough to preclude the investment tax credit in question. The parties stipulated that, for the first 12 months of the lease, the 8700 generated for GSP $ 47,314 of rental income and $ 7,963 of deductions allowable under section 162. By this measure, the deductions are over 16 percent of the income. Respondent contends, however, that some of the deductions were reimbursed by Computer Services, thus triggering the parenthetical in section 46(e)(3)(B) that requires an adjustment for reimbursed amounts. A reimbursed amount is any expense for which the lessee or some other party is obligated to reimburse the lessor. Sec. 1.46-4(d)(3)(ii), Income Tax Regs.
Respondent's position is that the FSMA base amounts paid by GSP to Xerox for part of March, all of April, all of November, and part of December of 1984 were reimbursed by Computer Services. The FSMA amounts for April and November were $ 1,965 each, the prorated March amount (following expiration of the 90-day warranty) was $ 1,245, *507 and the prorated December amount (up to the 1-year anniversary of the lease) was $ 951. With these amounts subtracted from the total deductions of $ 7,963, the remainder of $ 1,837 is less than 4 percent of rental income. Although respondent's computations stop here, the rental income must also be reduced for reimbursed amounts. Sec. 1.46-4(d)(3)(iii), Income Tax Regs. Even after this adjustment, deductions ($ 1,837) are still only 4.5 percent of rental income ($ 41,188). Petitioners counter that there was no direct relationship between the FSMA payments made by GSP to Xerox and the lease payments made by Computer Services to GSP. Petitioners point out that Computer Services made lease payments for every month from December 1983 through November 1984, while GSP made FSMA payments during the same period only for part of March and all of April and November. Further, argue petitioners, the click charge rate paid by Computer Services to GSP was much higher than that paid by GSP to Xerox. This is apparent from a comparison of tables 1 and 2 for November 1984, which shows the same 66,200 printed pages causing $ 742 of click charges in one instance and $ 212 in the other. We acknowledge *508 the differences cited by petitioners, yet we reject petitioners' argument that those differences are controlling. Neither section 46(e)(3)(B) nor the corresponding regulations define "reimbursed amounts" to mean only complete reimbursement. Moreover, the evidence clearly establishes a direct relationship between the two sets of payments. The lease provided for a monthly "off-season credit" of $ 1,965 from the usual (i.e., on-season) payment of $ 3,930. Although petitioners assert that any recharacterization is "convoluting" the facts, in substance and effect this arrangement is no different than an on-season premium of $ 1,965 added to the usual (i.e., off-season) payment of $ 1,965. Such an on-season premium matched, for the most part, the amount and timing of the FSMA base amount paid by GSP to Xerox beginning after the expiration of the 90-day warranty period. This matching was not mere coincidence. GSP knew in October 1983, when it entered into the purchase agreement and the FSMA with Xerox, that the 8700 was to be used by Computer Services; the purchase agreement called for installation there. Further, the three partners in GSP were collectively the controlling shareholder *509 group in Computer Services. Although GSP was contractually liable to Xerox for the FSMA payments, both the FSMA contract and the lease authorized Computer Services to control the maintenance coverage. Thus, when Computer Services notified Xerox to activate the FSMA, GSP was then obligated to Xerox for $ 1,965 a month (plus click charges) until further notice, and Computer Services was obligated to GSP in the same amount (plus click charges) for what we have labeled an on-season premium. The lease emphasizes the direct connection by stating that, upon the implementation or suspension of maintenance coverage, the monthly lease payment by Computer Services would be adjusted by "the corresponding amount" saved by or charged to GSP by Xerox. In addition, Gill testified about the reason for the off-season credit in the lease, stating that maintenance was unnecessary while the equipment sat idle. The obvious corollary is that the on-season premium paid for ongoing maintenance. Although we cannot explain why Computer Services made an on-season payment for May 1984 while the record lacks evidence of a corresponding FSMA payment by GSP, petitioners have not attempted to argue that this *510 discrepancy is meaningful. Indeed, the testimony of Gill and Sutow gave no indication that there was anything but perfect coordination between Computer Services, GSP, and Xerox concerning the timing of the maintenance coverage. On a different point, petitioners argue that a reimbursement is "a payment back, or the return of money", suggesting that Computer Services could only reimburse GSP for amounts earlier paid by GSP directly to Computer Services. We see no reason, however, to so limit the definition of reimbursement. Even petitioners' two cited cases, which are otherwise inapposite, take a broader view of the term. In Patchen v. Commissioner, 27 T.C. 592 (1956), affd. in part and revd. in part 258 F.2d 544 (5th Cir. 1958), the contractual reimbursements we described were made by clients to cover certain expenditures of an engineering firm, including employee salaries. Canelo v. Commissioner, 53 T.C. 217 (1969), affd. per curiam 447 F.2d 484 (9th Cir. 1971), similarly involved a three-party reimbursement situation. Attorneys acting under contingent fee arrangements paid for items such as court filing *511 fees and witness fees subject to client reimbursement in the event of a favorable judgment or settlement. As these cases illustrate, the commonly understood meaning of reimbursement goes well beyond the situation of A paying B and then B repaying A; that meaning also includes A paying C on B's behalf and then B repaying A. We believe that, within the meaning of section 46(e)(3)(B), the payments from Computer Services to GSP for April and November 1984 are properly characterized as reimbursements of payments GSP made to Xerox on behalf of Computer Services. We need not and do not address whether the following amounts paid by GSP were reimbursed within the meaning of section 46(e)(3)(B): (1) The $ 1,245 FSMA base amount for March 1984, which involves a prorated amount that does not coincide with the full Computer Services lease payment for the same month; (2) the $ 1,965 FSMA base amount for December 1984, for which the record lacks corresponding lease data; (3) the click charge for November 1984, which is substantially less than the corresponding click charge under the lease, and which respondent does not contend was reimbursed; and (4) the click charges for March, April, and December *512 1984, which involve either proration or insufficient comparative data, and again which respondent does not contend were reimbursed. Turning finally to the computation under the 15-percent test, we subtract the April and November 1984 reimbursements of $ 3,930 from the stipulated GSP deductions of $ 7,963, leaving $ 4,033. Subtracting the same reimbursements from stipulated rental income of $ 47,314 (pursuant to sec. 1.46-4(d)(3)(iii), Income Tax Regs.) leaves $ 43,384. Because adjusted deductions are only 9.3 percent of adjusted rental income, GSP falls below the 15-percent threshold in section 46(e)(3)(B) and is thus ineligible for an investment tax credit on the 8700 for 1983. It follows that petitioners, as GSP partners, are not entitled to distributive shares of the claimed investment tax credit and that Gill and the Sutows are not entitled to carrybacks of investment tax credits to 1980. The second issue for decision, which also concerns the 8700, is whether the depreciation deduction to which GSP is entitled for 1983 should be computed based upon a 1-month short taxable year. The parties agree that the 8700 is 5-year recovery property under the Accelerated Cost Recovery *513 System (ACRS) provisions of section 168. For the year in which such property is placed in service, the applicable percentage to be applied to the basis in computing the allowable deduction is 15 percent. Sec. 168(b)(1). Section 168(f)(5), however, provides a limiting exception for short taxable years: In the case of a taxable year that is less than 12 months, the amount of the deduction under this section shall be an amount which bears the same relationship to the amount of the deduction, determined without regard to this paragraph, as the number of months in the short taxable year bears to 12. * * * [5]
*514 On its 1983 partnership return, GSP claimed an ACRS deduction of $ 30,440 relating to the 8700, which did not account for a short taxable year. On brief, petitioners concede the applicability of section 168(f)(5), but argue for a 7-month short taxable year rather than the 1 month determined by the Commissioner. A taxpayer's taxable year is determined by the period for which it must file a return. Secs. 441(b), 7701(a)(23). A taxpayer that is in existence during only a part of a year is required to file a return for that short period. Sec. 443(a)(2); sec. 1.443-1(a)(2), Income Tax Regs. A partnership is considered a taxpayer for this purpose. Sec. 706(b)(1). A partnership cannot exist unless the ostensible partners have a good faith, present intent to conduct a business enterprise. Frazell v. Commissioner, 88 T.C. 1405, 1412-1413 (1987); Torres v. Commissioner, 88 T.C. 702, 736 (1987). Petitioners argue, without any citation of authority, that GSP "commenced business" in May 1983 because at that time they opened a bank account with capital contributions and applied for an employer identification number. In our view, however, petitioners *515 have not demonstrated that May 1983 is the appropriate beginning of GSP's short taxable year for purposes of section 168(f)(5). When asked how the partnership was "started", Sutow testified only about the opening of the bank account and the making of an initial deposit. He did not mention a partnership agreement, nor did he describe any contemporaneous business purpose. Moreover, petitioners have not explained why the 1983 partnership return for GSP shows a "Date business started" of October 13. Also seemingly inconsistent with a partnership commencement date in May is the total reported interest income of $ 196 on the 1983 partnership return; interest of over $ 300 had been credited to the money market account by June 20. Related to this point, the record overall is unclear as to when, if at all, before December 1983 the partnership first realized income or paid a deductible expense. See Williams v. Commissioner, T.C. Memo. 1987-308; sec. 1.6031-1(a)(1), Income Tax Regs.
Petitioners have failed to meet their burden of showing that the Commissioner was erroneous in determining a 1-month short taxable year under section 168(f)(5). Rule 142(a). To reflect *516 the foregoing, Decisions will be entered for respondent. Footnotes
1. Cases of the following petitioners are consolidated herewith: Alan A. Patel, docket No. 20103-88, and Paul F. Gill, docket No. 20104-88.↩
2. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. The parties have stipulated that the applicable basis in 1983 was $ 218,614, without taking into account a sec. 179 deduction of $ 5,000.↩
4. The 8700 had an attached meter that counted printed pages.↩
1. The total click charge for Dec. 1983 and Jan. 1984 was $ 1,077, but the record does not indicate the split between the 2 months.↩
1. Although there presumably was an April click charge, the applicable invoice is not a part of the record. The parties' stipulation assumes a click charge of zero.↩
5. Neither party has cited, and we therefore do not consider, sec. 1.168-2(f), Proposed Income Tax Regs., 49 Fed. Reg. 5940, 5947 (Feb. 16, 1984). Generally, proposed regulations carry no more weight than a position advanced on brief by respondent. F.W. Woolworth Co. v. Commissioner, 54 T.C. 1233, 1265-1266 (1970). Compare Arens v. Commissioner, T.C. Memo. 1990-241↩, in which we treated this particular proposed regulation as if final because both parties relied upon it.